679 So.2d 143 (1996)
Kimberly SYRIE, Plaintiff-Appellant,
v.
Victor SCHILHAB, et al., Defendants-Appellees.
No. 94-957.
Court of Appeal of Louisiana, Third Circuit.
March 27, 1996.
One Writ Granted, another Writ Denied June 7, 1996.
*144 Terry L. Rowe, Glenn John Armentor, Sera Hearn Russell, III, Lafayette, for Kimberly Syrie.
Homer Edward Barousse, Jr., James M. Cunningham, III, Stephen A. Stefanski, Crowley, for Robert Errol and Clayton Etie & Arceneaux.
William Littlejohn Goode, Paul Albert Landry, Lafayette, for DPS State Off. of State Police.
Steven Bernard Rabalais, Lafayette, for Guy Benitez et al.
*145 Before DOUCET, C.J., and YELVERTON, KNOLL, THIBODEAUX and COOKS, JJ.
COOKS, Judge.
In these consolidated cases, plaintiffs appeal a judgment of the trial court dismissing their claims for damages against the Louisiana State Police and Trooper Jacob Segura for personal injuries sustained during a vehicular accident. In written reasons for judgment, the trial court found Trooper Segura's actions preceding the accident were not negligent and his conduct was not a cause-in-fact of the mishap. We disagree.

FACTS
On the afternoon of November 19, 1989, at approximately 3:35 p.m., Gail Hart was traveling east on Interstate 10 when she lost control of her Honda automobile which collided into the left guard rail on an elevated portion of the interstate just east of Whiskey Bay Bridge. Assisted by a passing motorist, Hart maneuvered her vehicle to the right shoulder of the expressway, with its front facing westward in the direction of the oncoming traffic. An Iberville Sheriff's Deputy arrived at the scene first followed by State Trooper Jacob Segura who parked his vehicle facing eastward, with blue strobe lights flashing, approximately 150 feet from the front of the disabled car. Trooper Segura requested assistance from a wrecker service. Dewey Touchet was dispatched. Trooper Segura then indicated to the Iberville Sheriff's deputy that he would guard and supervise the scene. The deputy left. Approximately thirty to forty-five minutes elapsed before the wrecker truck arrived at the scene. During this period, the trooper conversed with Gail Hart and her son.
When Dewey Touchet arrived, he parked the wrecker truck facing eastward, with its light flashing, between Segura's patrol unit and Hart's Honda. The wrecker and Honda were facing each other approximately 50 to 75 feet apart. Touchet informed the trooper that the best position to tow the Honda was from the front end to avoid damaging its transmission. The two men decided it would take less maneuvering to turn the Honda around facing east.
All agree it was almost dusk and the rain had just subsided. Trooper Segura entered the right lane of travel first waving a flashlight covered by a reddish orange cone. A car, however, passed him in the left lane. He proceeded to the left lane, waving his hands and the light. The next car, driven by David Larson, stopped. Three or four cars following Larson's vehicle also managed to stop, including Nancy Davison operating a Chevy Blazer. Kimberly Syrie, driving a small blue Mazda RX7, then pulled from behind the larger Chevy Blazer changing to the right lane. Noticing Syrie's vehicle, Trooper Segura motioned for her to stop. Complying, she stopped in the right lane further back, even with the second or third car in the left lane. As Trooper Segura signalled for the wrecker driver to commence the turning maneuver, an eighteen wheeler tractor trailer truck, owned by Maverick Truck Line, Inc. and driven by Victor Schilhab, also moved from the left lane into the right lane behind Syrie's vehicle. The eighteen wheeler struck the Mazda, severely injuring Kimberly Syrie and fatally wounding Gail Hart who, standing behind the wrecker truck, was pinned between Syrie's vehicle and the wrecker. Her son, seated in the wrecker truck, was not injured. For sure, only seconds elapsed from the moment the trooper entered the travel lanes of the expressway and the fatal accident. The trooper's recollection of the events which unfolded as he signalled the traffic to stop and his control of the scene is not in accord with the witnesses.
Suit was filed by Hart's children against several defendants, including the State of Louisiana, through the Department of Public Safety and Correction, alleging that Trooper Segura's actions preceding the accident were negligent. Syrie and her parents filed a separate suit. The cases were consolidated. The issues of liability and damages were bifurcated. The liability phase of the trial proceeded. Finding the trooper actions were not negligent and his conduct was not a cause-in-fact of the accident, the claims against him, the State of Louisiana and its *146 insurer were dismissed. The Hart children and the Syries have appealed. For reasons expressed below, we reverse the trial court's judgment and remand both cases for further proceedings.[1]

LEGAL PRECEPTS
An appellate court is not free to set aside a trial court's factual finding at will. Before doing so, the reviewing court must find the factfinder manifestly erred or his conclusions were clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Stobart v. State, 617 So.2d 880 (La.1993); Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Where two permissible views of the evidence exist the factfinders' choice between them is not manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 883; Canter v. Koehring Co., 283 So.2d 716 (La.1973). However, the Louisiana Supreme Court in Ambrose v. New Orleans Police Amb. Service, 639 So.2d 216 and 221 cautioned:
"Notwithstanding the Court's earlier guidance to reviewing courts in Stobart v. State through DOTD, 617 So.2d 880 (La. 1993), it was not our purpose in that case to mandate that the trial court's factual determinations cannot ever, or hardly ever, be upset. Although deference to the factfinder should be accorded, the court of appeal, and the Louisiana Supreme Court, nonetheless have a constitutional duty to review facts. Of course, the reviewing court may not merely decide if it would have found the facts of the case differently. Rather, notwithstanding the belief that they might have decided it differently, the court of appeal should affirm the trial court where the latter's judgment is not clearly wrong or manifestly erroneous. Because the court of appeal has a constitutional function to perform, it has every right to determine whether the trial court verdict was clearly wrong based on the evidence, or clearly without evidentiary support."
While we are not free to disturb a trial court's judgment where two reasonable views of the evidence exist, nonetheless the trial judge in choosing between them is not free to disregard substantial and credible independent evidence or eyewitness testimony in favor of accepting solely self serving declarations uttered by interested parties. The latter decision is not reasonable nor permissible. We are constitutionally bound to review the record as a whole and to upset findings of fact that are not supported by legally sufficient evidence.
The Louisiana Supreme Court also has instructed that law enforcement officers' legal liability in tort cases must be determined by employing a duty/risk analysis. Blair v. Tynes, 621 So.2d 591 (La.1993); Vicknair v. Hibernia Building v. Corporation, 479 So.2d 904 (La.1985); Harris v. Pizza Hut of Louisiana, 455 So.2d 1364 (La. 1984); Smith v. Travelers Insurance Co., 430 So.2d 55 (La.1983). In doing so, the courts should inquire: (1) whether the conduct of which plaintiff complains was a cause-in-fact of the harm; (2) whether there was a duty on the part of the defendant which was imposed to protect against the risk involved; (3) whether there was a breach of that duty; and (4) damages.

ANALYSIS

A.

Cause-in-fact
First Trooper Segura, as found by the trial court, contends his conduct was not a cause-in-fact of the accident. He maintains that the accident resulted solely from the negligence of Schilhab in operating his vehicle at an excessive speed considering the circumstances and failing to timely heed his instruction to stop. Segura likens the facts in this case to those presented in Meaux v. Ideal Mutual Insurance Co., 479 So.2d 999 (La.App. 3 Cir.1985), writ denied, 481 So.2d 1353 (La.1986). Tailoring his argument accordingly, he invites us to assume "that [he] *147 and the emergency vehicles were nowhere near the scene and further assume that the same vehicles all stopped: David Larson stopped, Sharon Hartjies stopped, Glenda Adams Stopped, Nicole Patin Stopped, and Nancy Davison stopped, all in the left lane, and Kimberly Syrie stopped, first in the left lane, then in the right lane." He then suggests we engage in the following colloquy:
"Would Victor Schilhab have been reasonable in smashing into the rear of Kimberly Syrie's Mazda RX-7? Of course not. Did he have a duty, as a following motorist, to maintain a safe distance and a safe speed to facilitate a stop of his vehicle if the circumstances required? Absolutely. Should he have slowed his vehicle to a crawl, and raised his attention level to a high state of awareness, ready and able to respond immediately to any visual or aural stimulus? At the very least. Should he have brought his rig to a complete stop, in either the left lane or the right lane, without striking the rear of any preceding vehicle? Yes! Any contrary argument is absurd."
Though we affirmatively and with equal force answer all the questions posed by Segura, the negligence of Schilhab is not in question. The more pertinent question confronting us is whether the accident would have occurred even if Trooper Segura did not attempt to stop both lanes of travel on the expressway. The latter inquiry is rather straightforward. It is not cluttered with emotion or blame throwing. While factual in part, the inquiry is more dependent on the laws of nature and physics rather than behavior. Often, there is more than one cause-in-fact of an accident. Legal cause, thus, requires only a finding that the conduct complained of contributed in causing the eventual accident. To establish causation, plaintiffs were required to show only that "more probable than not, the accident would not have happened but for [Trooper Segura's] negligence." Wattigny v. Lambert, 408 So.2d 1126 (La.App. 3 Cir.), writ denied, 410 So.2d 760 (La.1981), cert denied, 457 U.S. 1132, 102 S.Ct. 2957, 73 L.Ed.2d 1349 (1982). In the context presented, the real question is whether the accident involving Kimberly Syrie's vehicle and the eighteen wheeler would have occurred on Interstate 10 had the trooper attempted to block only one lane of travel or forgone blocking any of the lanes of traffic. If we remove Trooper Segura from the scene as defendants suggest in brief or alter his conduct, we think not. The flow of traffic "more probable than not" would have proceeded straight ahead without interruption and the eighteen wheeler would have safely passed Hart's vehicle, the wrecker and the trooper's vehicle, all positioned on the right shoulder of the interstate. Had the trooper elected to stop traffic in only the right travel lane, again "more probable than not" the accident would not have occurred because Syrie and Schilhab would not have changed lanes. They would have proceeded straight ahead, though perhaps applying their brakes to adjust to traffic speed reduced because only a single lane of travel remained open. The trooper's conduct, thus, contributed to the occurrence of the accident. Unlike the facts in Meaux, the evidence does not support a finding that Schilhab was operating his vehicle in excess of the posted speed limit or that he would have struck Syrie's vehicle even if traffic was not stopped. The State of Louisiana and Trooper Segura encourage us, however, to overlook these factual differences; and, nevertheless, adopt the reasoning of the appellate court in Meaux and find Trooper Segura's conduct was not a legal cause of the accident. In that case, two deputy sheriffs were attempting to assist the driver of a stalled pickup truck. One of the officers proceeded to direct traffic into the left-hand lane to avoid obstruction in the right lane. The other officer "drove [his] patrol car in front of the pickup and turned it around to face the truck to attempt a jump start," but the carburetor of the disabled vehicle caught on fire. Brian Ackley, a fireman, was driving a fire truck with a group of probationary firemen aboard, including Meaux, when he noticed smoke and stopped to render assistance at the scene. The stalled vehicle, the fire truck, and the patrol car all were positioned in the right lane. Immediately prior to the accident, both sheriff's deputies were directing traffic by using hand signals to direct traffic to the unobstructed left lane of travel. Reciting the *148 events which transpired immediately prior to the accident, the appellate court noted: "The traffic was well controlled until Pamela Humphrey failed to move the Buick she was driving completely into the left-hand lane. The deputies were forced to jump out of the way as she straddled the line between the two eastbound lanes. She hit Steven Meaux, who rolled over the top of the car and landed on the ground.... There was evidence to show ... Humphrey was intoxicated and speeding at the time of the accident. The time elapsed between the arrival of the deputies and the occurrence of the accident was less than 20 minutes." Meaux complained the failure of the deputies to place their patrol car behind the stalled truck, to serve as both a shield and a warning, was a cause-in-fact of the accident. Even if the deputies had done so, the appellate court was not convinced the accident would not have occurred. The court found Humphrey failed to alter her course even after she must have realized an obstruction existed.
Defendants suggest that we reframe the conclusion in Meaux in the context of the instant case. Thus:
"His [Trooper Segura's] efforts at traffic control were successful until Victor Schilhab disregarded all indications that he should stop. Victor Schilhab failed to stop his vehicle, regardless of the lane he occupied, despite the existence of a string of vehicles stopped in the left-hand lane, Kimberly Syrie's vehicle stopped in the right-hand lane, and three vehicles stopped on the right-hand emergency shoulder. Plaintiffs-Appellants will no doubt argue in their appellate briefs that a cause-in-fact of the accident was the failure of Trooper Segura to place his patrol car in the right lane, as well as Trooper Segura's failure to take other actions. It cannot be certain that this action or these actions would have prevented Victor Schilhab from continuing in the right-hand lane in which Kimberly Syrie's vehicle was stopped. Victor Schilhab failed to respond to all visual stimuli even after he must have realized an obstruction existed."
Defendants' argument is internally flawed because the facts they urge us to assume are not supported by the record evidence in this case. Accepting Trooper Segura's version of the events preceding the accident, the trial court found he successfully controlled the flow of traffic by stopping traffic in the left lane and then seeing only Syrie's vehicle in the right lane he motioned for her to stop. After the traffic was completely stopped, according to Segura, he then beckoned the wrecker driver to begin repositioning Hart's vehicle when he heard a horn and turned noticing Schilhab's truck in the right lane approaching Syrie's vehicle at a high rate of speed. Although he waved in Kimberly Syrie's direction motioning her to move forward, she did not understand his instruction and the eighteen-wheeler slammed into the back of her vehicle eventually pinning Gail Hart against the wrecker truck. Trooper Segura's assertion that the traffic was under control just prior to the accident was supported solely by his testimony. The judge apparently accepted his account and found his conduct was not a cause-in-fact of the accident. The testimony of all the other eyewitnesses, who are not parties' in interest, substantially differed from Trooper Segura's recollection of the events immediately preceding the accident. The trial judge's decision to discount or ignore their factual accounts was manifestly erroneous. The record does not contain any evidence suggesting these witnesses were not credible or their versions were fabricated or distorted.
David Larson testified he was less than 100 feet from Segura when he noticed the trooper move to the right lane to avoid an oncoming car in the left lane. Relating what he noticed after the trooper moved to the right lane, Larson testified:
"Q. And what did he do after he moved into the right-hand lane?
A. It appeared as though he had to jump out of the lane because of some traffic coming.
Q. Did you observe what traffic was coming?
A. I looked over to the right and saw a blue Mazda and an eighteen (18) wheeler bumping into it.
Q. How long was it between the time that you brought your vehicle to a stop and the *149 time that you observed the Mazda and the truck?
A. About enough time to tell my wife, "Kelly, that cop sure looks pissed." About that much time.
Q. About how long was that?
A. Two or three seconds.
Q. About two or three seconds between the time you brought your vehicle to the stop and you first observed the Mazda and the eighteen (18) wheeler passing you by; is that correct.?
A. Could you repeat that?
Q. About two or three seconds between the time you brought your Porsche to a stop and you observed the Mazda and the eighteen (18) wheeler passing by the right of your vehicle?
A. Right.
* * * * * *
Q. When you saw the eighteen (18) wheeler coming by, can you estimate how fast it was traveling?
A. About forty (40) miles per hour.
* * * * * *
Q. About how far were you from the trooper when you first realized, "I've got to stop my vehicle."
A. Less than a hundred (100) feet.
Q. Less than a hundred (100) feet. In fact, the vehicle that had passed earlier, I believe, almost hit the trooper, is that correct?
A. Right.
Q. Mr. Larson, were you surprised at having to stop in the left hand lane of traffic?
A. Yes.
Q. What went through your mind as you saw those blinking blue lights?
A. I decided to slow down. I was thinking that the guy had pulled a speeder over, so I got in the left lane.
Q. When the Mazdawhen you visualized the Mazda two or three seconds after you stopped as it was passing you, had it been hit by the eighteen (18) wheeler?
A. It had been.
Q. Was it a situation where when you looked and saw it, the collision was occurring?
A. That's right. It was getting bumped from behind.
Q. Do you recall whether or not you had to brake fairly hard, brake your Porsche fairly hard in order to stop?"
Sharon Hartjes, traveling behind Larson, similarly recalled the events just prior to the accident. She testified:
"A. Okay. There was a lot of traffic on the highway. And as the officer was having all of us stop, everybody behind me was stopping. And it happened quick. The car ahead of me stopped. I stopped. The car behind me stopped. And all of a sudden I could hear the squealing of brakes of several vehicles stopping.
Q. Did that direct your attention to the rear of your automobile?
A. Yes, it did at that time. I glanced in my rear view mirror.
Q. And what did you see?
A. I saw the lights of the vehicle stopping. I heard the squeal of the brakes. I heard the squeal of the brakes. I heard the blast of the horn of the truck. I heard the crash. I looked over. I saw them come past on my right side. At the same time I saw a white vehicle coming out onto the roadway. The truck and the car went past me. The little Mazda hit the white vehicle. The tow truck flipped around and headed towards us and the truck went across to the right at an angle. And it all happened almost instantly."
Q. All right. Based upon how fast you were going right before you stopped and understanding at the time you looked over your shoulder, your vehicle was stopped, can you estimate for the Court approximately how fast the eighteen (18) wheeler was traveling?
A. No, I can't. I can't really estimate the speed, but I knew thatI could tell that he was not traveling very fast, because the lights were coming up over my shoulder slow."
Nancy Davison's vehicle was four or five cars behind Larson and nearest Syrie's vehicle *150 then positioned in the right lane. Like the other witnesses, she testified:
"A. I brought my car to a stop. And the squealing that I heard, I thought it was me. And the squealing continued. I looked in the rearview mirror, saw the swerving behind me would not be able to stop. So I knew that I would be getting."
"Q. From the time that you first saw the brake lights come on the vehicle ahead of you to the time that you were able to stop your car, can you give us an idea of about what period of time passed in terms of minutes, seconds?
A. It happened so rapidly, just seconds. From the time that I saw the lights flashing and the time I came to a stop, it was just an immediate situation for me."
Q. So it was one continuous motion.
A. Continuous. It was just continuous. All I know is I stopped, the squealing remained. So I leaned, looked up. It happened that fast."
Q. How quickly did you have to bring your vehicle to a stop?
A. Quickly. To say that Ia sense of the domino effect as far as the red lights, the rear lights of the cars and just having to remember just laying on them and turning to the side, just thinking "I've got to get this car stopped."
Q. In response to the questions that were posed by opposing counsel, it might appear that all these events took some period of time to unfold.
A. The feelings inside, it took just seconds. And the stop, the turn, the look, the impact, it was just immediate."
Q. You slammed on your brakes?
A. Correct.
Q. What, if anything, happened to the equipment which was in the rear of your vehicle?
A. My infant's swing was in the back. And whenit flew over to the trundle seat right nextbehind me. It just flew over the side into the back behind me. So it was in theit was in the luggage department on top. And when I stopped, it flew over into the seatwhich the S-10 has two (2) seats. And it flew over the top and landed on the floor and behind."
Schilhab admitted he saw flashing lights ahead. Realizing the traffic was stopped in the left lane, he initially prepared to stop by holding his "jake" brakes. However, noticing Syrie's vehicle change to the right travel lane, he assumed this lane was open and thus proceeded to follow Syrie's vehicle. Within seconds, Syrie abruptly stopped her vehicle midway between the cars parked in the adjacent lane. Schilhab was not able to stop the heavier eighteen wheeler before it collided with Syrie's automobile. Schilhab testified he would have been able to come to a complete stop if Syrie had not stopped in front of him.
While Schilhab's negligence in failing to reduce his speed and remain prepared to stop his vehicle most assuredly was a cause-in-fact of the accident, his negligence did not supersede or override Trooper's Segura's action in abruptly stopping traffic in both travel lanes. The witnesses' testimony simply does not support the trial court's finding that Trooper Segura successfully controlled the traffic in both lanes before motioning the wrecker driver to proceed with the turning maneuver. To the contrary, the witnesses all confirmed only seconds elapsed between the time they noticed the trooper in the travel lanes of the expressway, stopped their vehicles and the occurrence of the accident. While he noticed the trooper's vehicle parked on the right shoulder with strobe lights flashing, Larson initially assumed he was issuing a citation to an offending vehicle and he moved his vehicle in the left lane. He then saw Trooper Segura move into the right lane seemingly to avoid an oncoming car proceeding in the left lane. Applying his brakes forcefully, he stopped his vehicle; but, he noticed in his rearview mirror almost simultaneously Syrie's vehicle in the right lane as it was struck by the eighteen wheeler and Trooper Segura jump back into the left lane. The whole sequence between the time he stopped his vehicle and saw Syrie's vehicle being struck transpired in two to three seconds or, as he puts it, in the time it took to tell his wife "that cop sure looks pissed." Hartjies and Davison, both proceeding behind *151 Larson, similarly expressed they were required to forcefully apply their vehicle's brakes before coming to complete stops. Davison, the vehicle immediately ahead of Syrie, recalled she heard brakes squealing and she in turn slammed her brakes hard. She managed to stop the vehicle she was operating, but she continued to hear squealing brakes and feared her vehicle would be struck from behind. She and Hartjies confirmed the accident occurred within seconds after they stopped. The sequence of events was like a "domino effect," in Davison's words.
We are convinced the record evidence establishes the accident would not have occurred "but for" the combined conduct of Trooper Segura and Schilhab. Unlike the facts presented in Meaux, Schilhab was not operating his vehicle at a rate exceeding the posted speed limit, albeit he should have reduced the speed of the vehicle under the circumstances. He was not intoxicated or otherwise impaired. Schilhab did not fail to alter his course after noticing flashing lights ahead. Although his decision was not the most prudent and constituted negligence, he assumed only the left lane was blocked when he noticed Syrie's vehicle change to the right lane which appeared unobstructed. He did not consciously barrel through a police road block, as suggested by defendants. The Trooper's unit and the wrecker truck, both with flashing lights turned on, were parked on the shoulder of the expressway. They were not obstructing traffic in the right lane. It was not unreasonable or unexpected that approaching motorists might assume the lane was unobstructed and available for travel. Trooper Segura's decision to stop the right lane of traffic, as abruptly as he stopped traffic in the left travel lane, was a contributing cause-in-fact of the accident. The trial court's contrary factual conclusion was clearly wrong.

B.

Existence of a Duty
When a law enforcement officer becomes aware of a dangerous traffic situation, he has the affirmative duty to see that motorists are not subjected to unreasonable risks of harm. Duvernay v. State, Dept. Of Public Safety, 433 So.2d 254 (La.App. 1 Cir.), writ denied, 440 So.2d 150 (La.1983); Monceaux v. Jennings Rice Drier, Inc., 590 So.2d 672, 675 (La.App. 3 Cir.1991). As the Louisiana Supreme Court stated in Blair, 621 at 596, "[t]he legislature has given law enforcement officers the exclusive power to regulate traffic and the public has a corresponding obligation to follow traffic regulations. Law enforcement officers are duty bound to exercise this power reasonably to protect life and limb and to refrain from causing injury or harm." See also LeJeune v. Allstate Ins. Co., 365 So.2d 471 (La.1978); Prattini v. Whorton, 326 So.2d 576 (La.App. 4 Cir.1976). This duty extends not only to prudent, attentive drivers but to those who are momentarily inattentive or careless. Burge v. City of Hammond, 494 So.2d 539 (La.1986).
Defendants do not argue Trooper Segura did not have a legal duty to supervise the towing maneuver or that he was not required to take reasonably safe steps to stop approaching traffic if necessary to effectuate this end. Rather, they argue trooper Segura did not breach the duty legally imposed upon him under the circumstances.

C.

Breach of Duty
The trial court found Trooper Segura's failure to use flares or other reflective clothing did not constitute negligence. He accepted the testimony of Trooper Segura and several state troopers, who all testified "flares are to be used only in situations where lanes are to be blocked for a prolonged period of time, and not for a short instance as was done here."
Captain Mark Oxley, who testified regarding the appropriateness of Segura's action, admitted he had not heard the witnesses' version of the accident prior to trial and he conceded:
"A. If breaking was occurring in rapid fashion and vehicular traffic was diverted from its normal path, then that would constitute an emergency.
Q. Which is the type of thing that your State Troopers under your command want *152 to avoid when investigation [sic] accidents on Interstate 10, correct?
A. Yes.
Q. And had you been given those facts, regardless of by whom, whether it was by Trooper Segura, by Sergeant Baxter or anyone else, then certainly, at the very least, you would have talked seriously with Trooper Segura about avoiding that situation in the event?
A. I would have investigated those facts. I would have looked into that type of information."
Officer Vic Summers (called to testify as an expert for the defense) with great reluctance, likewise, conceded state troopers are not taught at the training academy "to create a situation where four or five vehicles traveling in one lane have to slam on their brakes in order to avoid, not only the police officer whose trying to stop them, but each other."
The record evidence convinces us Trooper Segura breached his legal duty to safely effectuate the towing maneuver without exposing approaching motorists traveling on Interstate 10 to greater danger. Trooper Segura should have known that drivers traveling on Interstate highways, particularly the Atchafalaya swamp expressway, often operate their vehicles at speeds approaching and even exceeding the posted speed limit. Trooper Segura confirmed plaintiffs' expert testimony that motorist have a natural tendency to use an "unblocked free lane" when they observe stopped traffic. Despite this knowledge, he elected nonetheless to abruptly stop traffic in both travel lanes. We are satisfied his decision to do so exposed Kimberly Syrie and Gail Hart to unreasonable risks of injury. He created an emergency situation when viable alternatives were available to safely stop the flow of traffic. He could have stopped traffic in one lane first and then waited to determine whether traffic could be stopped safely in the second lane. Instead with haste and without much forethought, he stepped in both lanes of travel and attempted to stop traffic armed with only a flashlight. His parked vehicle, with strobe lights flashing, was not sufficient to warn the approaching motorist of his intent to stop both lanes of travel. Trooper Segura was duty bound to take reasonable steps to avoid further endangering the approaching motorists.
All the witnesses, except Trooper Segura, testified the events preceding the accident occurred in a matter of seconds. The skies were overcast, it was dusk, and the roadway was wet. Trooper Segura should have known the weather and road conditions were not ideal and, to some extent, limited the approaching motorists' ability to quickly notice him waving a flashlight and stop their vehicle without swerving or skidding. The drivers in front of Syrie's vehicle all stated they were required to apply their brakes with pressure to avoid colliding with the cars in front of them or striking the officer. When Syrie's vehicle entered the right travel lane, according to these witnesses, it was struck almost immediately by Schilhab's eighteen wheeler.
The trial court legally erred in casting blame entirely on Schilhab for causing the accident. In hastily stopping traffic in both lanes on a well traveled portion of Interstate 10, Trooper Segura breached his legal duty and his conduct constituted actionable negligence. Syrie's decision to move her vehicle to the right lane was neither unusual nor unexpected. The fact that she was able to observe the trooper and to stop her vehicle did not assure that another driver, momentarily distracted or simply careless, would not enter the right lane of traffic and collide with Syrie's vehicle. Trooper Segura owed a duty to protect Syrie and Hart from foreseeable risks of injury.

D.

Damages
As mentioned, the trial was bifurcated. Only state trooper Segura's liability was at issue at the first stage of the proceedings. Finding the trooper was not negligent, the trial court dismissed on all claims against him, the State and its insurer without assessing the extent of damages sustained by plaintiffs and allocating fault. In deciding to reverse the trial court's judgment, we remand the case for further proceedings consistent with this opinion and with instruction that he *153 entertain the issues mentioned and render judgment accordingly.

DECREE
The trial court's judgment dismissing plaintiffs' claims against Trooper Segura, the State of Louisiana, and its insurer is hereby reversed and the case is remanded for further proceedings. All costs on appeal are assessed against defendants-appellees.
REVERSED AND REMANDED.
KNOLL, J., concurs in the results only.
YELVERTON, J., dissents and assigns written reasons.
DOUCET, C.J., dissents for reasons assigned by YELVERTON, J.
YELVERTON, Judge, dissenting.
The trial judge made a factual finding, supported by competent evidence, that Trooper Segura's decision to close both lanes was in accordance with accepted policy and procedure for accident site control. The court also found that Trooper Segura had no duty to require Hart and her son to leave the accident scene. The trial court further found that flares were not necessary for the short time it would take to move the Honda. He found that none of the motorists had trouble seeing Trooper Segura. The court found that the sole cause of the accident was the negligence of the eighteen-wheeler driver.
I dissent from the majority's opinion because I find that the trial court's factual findings were adequately supported by the record and were not manifestly erroneous. Although there was testimony in the record as to what possible other actions Trooper Segura may have taken, there was also testimony to support his actions. Additionally, we cannot require that a state trooper be held responsible for the grossly negligent actions of a driver.
All drivers saw the trooper's lights before they reached the accident site. They slowed down. The first few cars had to stop in surprise because they thought someone was getting a ticket until they saw Trooper Segura flagging down traffic, but they came to a complete stop. Subsequent cars were able to stop gradually. None of these vehicles hit each other. Trooper Segura's procedure was doing the job safely. Even Syrie had stopped and changed lanes until just shortly before she was run over by Schilhab's eighteen wheeler.
Schilhab's credibility was put at issue when he testified he lost his brakes because he lost the air. Plaintiffs' expert agreed that if an eighteen wheeler loses air, the brakes come on automatically. There is evidence in the record supporting the trial judge's finding that the cause of the accident was Schilhab's excessive speed and not Trooper Segura's actions.
I respectfully dissent.
NOTES
[1] We have this day rendered a separate judgment in Etie v. Schilhab, et al, 679 So.2d 153 (La.App. 3 Cir.1996) (our docket No. 94-958), adopting our holding in this case and remanding that case for further proceedings below.