693 So.2d 1173 (1997)
Kimberly SYRIE et al.
v.
Victor R. SCHILHAB et al.
Robert Sidney ETIE et al.
v.
Victor R. SCHILHAB et al.
No. 96-C-1027.
Supreme Court of Louisiana.
May 20, 1997.
Rehearing Denied June 20, 1997.
*1175 Richard P. Ieyoub, Attorney General, William Littlejohn Goode, Paul Albert Landry, Lafayette, for applicant.
Sera Hearn Russelll, III, Stephen A. Stefanski, Edwards, Stefanski, Cunningham, Stefanski & Zarinbrecher, Crowley, for respondent.
MARCUS, Justice.[*]
These consolidated cases arise out of a multi-vehicular accident which occurred on November 19, 1989, on the eastbound side of Interstate 10 in Iberville Parish, Louisiana, on an elevated part of the highway over the Atchafalaya Basin approximately three miles east of the Whiskey Bay Bridge. Gail Hart was traveling east on Interstate 10 about three-thirty in the afternoon when she lost control of her Honda automobile and collided with the left guard rail of the two-lane eastbound side of the interstate sustaining damage to the left front of the vehicle. Neither she nor her twelve year old son who was a passenger in the vehicle sustained injuries. A passing motorist assisted Ms. Hart in moving her vehicle to the right shoulder facing westward in the direction of oncoming traffic.
An Iberville Parish deputy sheriff arrived at the accident scene followed by State Trooper Jacob Segura. Trooper Segura parked his police unit on the right shoulder with the blue strobe lights flashing about one hundred fifty feet west of Ms. Hart's Honda. Trooper Segura called for wrecker assistance to tow the vehicle to Lafayette. The motorist who assisted Ms. Hart offered her and her son a ride to Baton Rouge but they preferred to stay with the vehicle. The motorist and the deputy sheriff left. About thirty to forty-five minutes elapsed before Dewey Touchet from Guy's Towing Service arrived at the scene. He parked the tow truck with its flashing yellow beacon lights on the outside right shoulder between the police car and Ms. Hart's vehicle facing Ms. Hart's vehicle with about fifty feet between them. After observing the situation, Mr. Touchet thought that the best position to tow the Honda was from the front end to avoid damage to the transmission. After discussing the matter with Trooper Segura, it was decided to turn the Honda around rather than the tow truck because it would take less maneuvering. Trooper Segura would stop the traffic in both lanes of the interstate and then signal Mr. Touchet who would turn Ms. Hart's vehicle around ending up behind the wrecker. Trooper Segura told Ms. Hart and her son to "stay out of the way" until the maneuver was completed.
When the procedure commenced it was overcast and almost dusk and the rain had stopped but the highway was damp and the shoulders were wet. Trooper Segura entered the right lane of the interstate waving a flashlight covered with a reddish-orange cone. There was no traffic in the right lane. Trooper Segura let the first vehicle in the left lane continue past him because it was going too fast. He then stepped into the left lane to stop the flow of traffic. At least four or five vehicles stopped one behind the other in the left lane without incident. A blue Mazda driven by Kimberly Syrie was preparing to stop in the left lane when it pulled from behind the vehicles already stopped in front of it and changed to the unoccupied right lane and stopped about even with the second or third vehicle in the left lane.
Trooper Segura turned back toward Mr. Touchet in the Honda. Mr. Touchet then *1176 began to move the Honda from the shoulder into the right lane. A seventy-five foot eighteen-wheeler tractor-trailer truck driven by Victor Schilhab and owned by Maverick Truck Lines, Inc., which had been proceeding in the left lane, switched to the right lane and began to honk its horn. The truck did not stop. Trooper Segura shouted and motioned to Ms. Syrie to move forward to attempt to get her out of the truck's path but she remained stopped in the right lane. The truck struck the Mazda from the rear and propelled it forward until it struck the parked wrecker. Ms. Hart who had been standing behind or downstream from the wrecker was pinned between the wrecker and the Mazda and received fatal injuries. Her son was seated in the wrecker and was not injured. Ms. Syrie received severe injuries in the accident.
Wrongful death and survivor actions were filed by Ms. Hart's children against Victor Schilhab, Maverick Truck Lines, Inc., Guy's Towing Service, Dewey Touchet, various insurers, the State of Louisiana through the Department of Public Safety and Corrections, Office of State Police (the State) and Trooper Jacob Segura. Kimberly Syrie filed a separate suit for personal injuries against the same defendants. The cases were consolidated and plaintiffs settled with all defendants prior to trial except Trooper Segura and the State. The issues of liability and damages were bifurcated. Following the liability phase of the trial, the trial judge rendered judgment in favor of Trooper Segura and the state and against plaintiffs, finding that plaintiffs failed to prove that the actions of Trooper Segura caused the accident and that the sole cause of the accident was the negligence of Victor Schilhab in traveling at an excessive speed under the circumstances and failing to bring his vehicle to a stop when required. Plaintiffs appealed. The court of appeal in a 3-2 decision reversed, finding that the trial court erred in assessing fault solely against Mr. Schilhab.[1] It concluded that Trooper Segura breached his legal duty to the plaintiffs and his conduct along with that of Mr. Schilhab constituted negligence. It remanded the case to the district court for the allocation of fault and the assessment of damages. Upon application by Trooper Segura and the State, we granted certiorari to review the correctness of that decision.[2]
The sole issue for our determination is whether the court of appeal erred in reversing the trial judge's finding that Trooper Segura was not negligent and that the sole cause of the accident was the negligence of the truck driver, Mr. Schilhab.
A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). This court has announced a two-part test for the reversal of the factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993). The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong but whether the factfinder's conclusion was a reasonable one. Id. at 882. Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. Theriot v. Lasseigne, 93-2661, p. 9 (La.7/5/94), 640 So.2d 1305, 1313. The reviewing court must always keep in mind that if the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as trier of fact, it would have weighed the evidence differently. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990).
In order to determine whether liability exists under the facts of a particular case, our court has adopted a duty-risk analysis. Under this analysis, plaintiff must prove that the conduct in question was a cause-in-fact of *1177 the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty breached. Berry v. State, Through Dept. of Health and Human Resources, 93-2748, p. 4 (La.5/23/94), 637 So.2d 412, 414; Mundy v. Dept. of Health and Human Resources, 620 So.2d 811, 813 (La.1993). Under the duty-risk analysis, all four inquiries must be affirmatively answered for plaintiff to recover. Mathieu v. Imperial Toy Corp., 94-0952, p. 4 (La.11/30/94), 646 So.2d 318, 322.
In deciding this case through the application of the duty-risk analysis, we choose first to examine the issue of what was the duty Trooper Segura owed to Ms. Hart and to Ms. Syrie. We stated in Blair v. Tynes, 621 So.2d 591, 596 (La.1993), that the legislature has given law enforcement officers the exclusive power to regulate traffic and the public has a corresponding obligation to follow traffic regulations. Law enforcement officers are duty bound to exercise this power reasonably to protect life and limb and to refrain from causing injury or harm. When a law enforcement officer becomes aware of a dangerous traffic situation, he has the affirmative duty to see that motorists are not subjected to unreasonable risks of harm. Monceaux v. Jennings Rice Drier, Inc., 590 So.2d 672, 675 (La.App. 3d Cir.1991). In Mathieu, 94-0952 at 10, 646 So.2d at 325, this court stated that the scope of an officer's duty is to choose a course of action which is reasonable under the circumstances. In other words, the scope of an officer's duty to act reasonably under the circumstances does not extend so far as to require that the officer always choose the "best" or even a "better" method of approach.
Next, we must determine whether Trooper Segura breached this duty. Plaintiffs, through the testimony of various experts, contended that Trooper Segura breached his duty because he did not use flares or cones or wear reflective clothing and he did not call for back-up assistance. They argue that he should have used his police unit rather than himself to create a road block, he should have closed only one lane of interstate traffic, he should have secured the pedestrian (Ms. Hart) at the scene of the accident or required her to leave. In sum, plaintiffs and their experts attempted to prove that Trooper Segura breached his duty to plaintiffs and was negligent by showing that "different" or "better" options were available. However, our task is not to determine whether Trooper Segura should have acted differently or if there were better options available to him but only whether his actions were reasonable under the totality of the circumstances.
Trooper Segura, a state trooper for fifteen years, testified that the decision was made in conjunction with the wrecker driver, Dewey Touchet, to turn the Honda around to end up behind the wrecker for towing purposes. He estimated the maneuver to take less than thirty seconds. The Honda was damaged and leaking fluid as a result of the earlier accident. He considered the better approach to the situation was to stop both lanes of traffic in case the maneuver could not be completed by using only the right lane or in the event the damaged vehicle could not complete the maneuver. Mr. Touchet agreed with the decision to stop both lanes of traffic to perform the task. Trooper Segura asked Ms. Hart and her son to stay out of the way during the procedure. He testified that he could see almost three miles back to the Whiskey Bay Bridge. He waited for a break in the traffic to start the maneuver.
The first vehicle to stop in the left lane belonged to Mr. Larson. He testified that he saw the blue lights from the police unit on the side of the road about a mile ahead. He saw Trooper Segura about two hundred feet ahead and realized he had to stop his vehicle. He brought his vehicle to a complete stop without skidding. The next vehicle in the left lane, belonging to Sharon Hartjes, also came to a stop without incident and so did another vehicle belonging to Glenda Adams. Nicole Patin, the driver of another vehicle in the left lane, testified by way of deposition that she saw the flashing lights in the distance and thought that she would eventually have to stop so she slowed down her vehicle and was able to see Trooper Segura from about one-fourth of a mile away standing in *1178 the center of the interstate. She brought her vehicle to a stop and parked. Nancy Davison was also able to stop her vehicle slightly angled in the left lane of traffic. Ms. Syrie's Mazda pulled up behind Ms. Davison before pulling out and changing to the right lane.[3] Thus, Trooper Segura was able to safely stop at least five vehicles without incident before he turned around in order to signal Mr. Touchet to begin the turnaround maneuver. He then heard a truck horn blowing and saw the tractor-trailer rapidly approaching and realized that it had no intention of stopping.
Stanley Griffin, a state trooper, testified that he had worked the elevated portion of Interstate 10 over the Atchafalaya Basin for over ten years. He testified that it is routine practice to close off both lanes of oncoming traffic while working an emergency situation and he had done so a number of times without assistance and had experienced no accidents or incidents. He further testified that for a short-term maneuver it was easier and faster to work the situation himself than to use the police unit to block traffic. Trooper Summers, a trainer of state troopers qualified in the field of accident scene protection and traffic control, testified that Trooper Segura was correct in leaving his police unit on the shoulder to alert approaching traffic and to protect the disabled vehicle and the wrecker on the right shoulder. He further testified that the manner in which Trooper Segura had stopped traffic by using his body and hand signals was appropriate and in keeping with recognized standards and procedures of traffic control. John Blunschi, Trooper Segura's training officer, testified that he would request additional assistance or use cones or flashing devices for a long-term operation but not for a short-term maneuver. While plaintiffs presented their own experts who in their opinions would have acted differently under the circumstances, Trooper Segura's associates and defense experts testified that his actions were in conformity with accepted traffic control procedures at the scene of an accident or emergency situation. After reviewing the record in its entirety, we find that the method that Trooper Segura utilized to attempt to remove the Hart vehicle from the shoulder of the interstate was reasonable. Moreover, we find that Trooper Segura acted reasonably in allowing Ms. Hart and her son to remain at the accident scene. Ms. Hart had refused an offer to leave the scene and insisted that she wanted to stay with her vehicle. Trooper Segura warned them to stay out of the way during the maneuver. Even plaintiffs' expert agreed that Ms. Hart could not be forced to leave the accident scene. Accordingly, we conclude that Trooper Segura did not breach any duty imposed upon him. Clearly, the trial judge's finding of no fault on the part of Trooper Segura was not manifestly erroneous.
We consider the sole cause of the accident was the negligence of Victor Schilhab. Mr. Schilhab was driving an eighteen-wheeler tractor-trailer which weighed about 70,000 pounds including its load under wet conditions. He testified by deposition that as he approached the Whiskey Bay Bridge, he heard on his CB radio that a policeman was giving a ticket up ahead. He testified that as he descended the bridge he was in the left lane and going about fifty-five miles per hour, the posted speed limit. He saw the flashing lights on Trooper Segura's police unit on the shoulder and he applied his "jake brake" and began gearing down.[4] While some of the witnesses to the accident did not think that the truck was going very fast when it approached the scene, others testified that it was going at a fast rate when it descended the bridge and that the truck seemed out of control. Jeffrey Milburn, an accident reconstructionist for the defense, estimated Mr. Schilhab's speed at the time of impact to be about sixty-three miles per hour. Accordingly, the trial judge's finding that Mr. Schilhab's negligence in traveling at an excessive speed and in failing to stop his *1179 vehicle was the sole cause of this accident was not manifestly erroneous.
In sum, Trooper Segura did not breach any duty to plaintiffs. In determining no breach of duty, there can be no finding of liability of Trooper Segura and the State. The sole cause' of the accident was the negligence of Victor Schilhab. The court of appeal erred in finding otherwise. We must reverse.

DECREE
For the reasons assigned, the judgment of the court of appeal is reversed. The judgment of the district court dismissing the suit against Trooper Jake Segura and the State of Louisiana is reinstated. All costs are assessed against plaintiffs.
LEMMON and JOHNSON, JJ., dissent and assign reasons.
CALOGERO, C.J., dissents for reasons assigned by LEMMON, J.
LEMMON, Justice, dissenting.
I voted to grant certiorari in this case because it appeared that the court of appeal acted as a second tier finder-of-fact and substituted its judgment for that of the trial court. However, irrespective of the factual findings of the trial court,[1] I have applied a duty-risk analysis and now conclude that the trial court's incorrect focus on Trooper Segura's failure to use flares for a brief highway blockage caused error in the court's cause-in-fact determination. I further conclude that the trooper was negligent in attempting to stop all traffic on a high speed elevated interstate highway after sundown in dark clothes using only a flashlight, when he could have parked the police unit with its flashing blue lights in the travel lane (rather than on the shoulder) during a break in the flow of traffic or could have used the flares in the police unit to warn oncoming traffic that it was necessary, not just to slow as indicated by the flashing lights on the police unit on the shoulder, but that both traffic lanes were being blocked. Finally, while I agree with the majority that the trooper was only required to choose a reasonable course of conduct rather than to choose the best available option, I disagree that the trooper chose a reasonable course of conduct under the circumstances.

Cause-in-Fact Element
The initial inquiry in the duty-risk analysis is whether the complained-of conduct by the defendant was a cause-in-fact of the tort victim's injuries. The cause-in-fact inquiry must focus on the particular conduct that is alleged to be negligence on the part of the defendant. In the present case, the conduct of the driver of the eighteen wheeler in driving inattentively and in failing to keep his vehicle under control clearly was a cause-in-fact of the injuries. However, there can be, and frequently is, more than one cause-in-fact of the tort victim's injuries.
The cause-in-fact element is usually a "but for" inquiry which tests whether the injuries would not have occurred but for the defendant's conduct. To be a cause-in-fact, the conduct must be a substantial factor in bringing about the tort victim's harm. Fowler v. Roberts, 556 So.2d 1 (La.1989); Frank L. Maraist & Thomas C. Galligan, Jr., Louisiana Tort Law §§ 4.2, 4.3 (1996).
As to Trooper Segura, plaintiffs alleged he was negligent (1) in blocking both lanes of traffic, rather than only one,[2] and (2) in failing to use the police unit's flashing blue lights in the travel lanes or flares on the scene in order to accomplish the traffic control.[3] However, since I agree with the majority *1180 that blocking both lanes was not negligence, I focus only on whether the trooper's failure to use the flashing blue lights of the police unit or flares to accomplish the lane blockage was a cause-in-fact of the injuries.
Most of the eyewitnesses testified that they saw flashing blue lights on the shoulder of the highway from a considerable distance and believed that a trooper probably had stopped a "speeder." They slowed slightly and moved into the left lane, but were not expecting an impending necessity to stop and were surprised when they were required to stop. Several testified that they would have expected to stop if they had seen flares or if the police unit with its flashing blue lights had been on the highway rather than the shoulder.
While generally the determination of cause-in-fact is primarily a question of fact, the trial court ruled that the trooper's failure to use flares was not a cause-in-fact of the accident primarily because of testimony of other troopers that flares are generally used for lengthy lane blockages. The appropriate analysis of cause-in-fact in the present case is not whether the lanes had to be blocked for a lengthy period, but whether flashing blue lights of the police unit in the traffic lanes or flares on the scene would have alerted the driver of the eighteen wheeler and caused him to stop in time to avoid the accident.[4] If plaintiffs proved that the use of such devices would have prevented the accident, then conversely the trooper's failure to use such devices was a cause-in-fact of the accident.
The pivotal cause-in-fact issue in this case is whether the inattentive driver of the eighteen wheeler would have acted differently if he had been warned of the necessity to stop by flashing blue lights in the travel lanes or by flares. If so, then the trooper's failure to use these devices was a concurrent cause of the accident.
I conclude that plaintiffs, by presenting witnesses who testified that they would have been prepared to stop a greater distance from the point of impact if the trooper had used the flashing blue lights of the police unit in the lanes of travel or flares on the scene, proved more probably than not that the inattentive driver of the eighteen wheeler would have been alerted to the fact that he was required to stop at a much earlier time and that he attentively and at a slower speed would have brought his unit to a successful stop, thereby avoiding the accident.

Duty Element
The court of appeal correctly held that Trooper Segura had a duty to take reasonably safe steps under the circumstances to control the traffic on the high speed elevated interstate highway during the turnaround maneuver. The critical inquiry is whether he breached that duty.

Breach of Duty Element
Trooper Segura attempted to block both lanes of a high speed elevated interstate highway after sundown in dark clothes using only a small flashlight, although he had flares available in his police unit and he also could have moved the police unit with its flashing blue lights into one or both travel lanes when there was a sufficient break in the oncoming traffic.[5] As stated earlier, most of the eyewitnesses testified that they believed, upon seeing the flashing blue lights on the shoulder of the highway from a great distance, that a policeman was issuing a ticket for a traffic violation. They slowed slightly and moved into the left lane, but were not alerted by the flashing blue lights on the shoulder that cars in the traffic lanes would *1181 be required to stop. Several eyewitnesses testified that had they seen flares in the area, they would have expected to stop and would have reacted accordingly. Although it is significant that all of the motorists who stopped in the left lane did so without making contact with the vehicle in front, although several had to slam on their brakes, it is at least equally significant that the eighteen wheel tractor-trailer unit with a 70,000-pound load required much more stopping distance than an automobile or a minivan.
A trooper's stopping traffic on a high speed elevated interstate highway after sundown is an extremely dangerous task, even when carried out with the utmost safety precautions. Attempting to do so in dark clothes with only a flashlight, while the flares remained in the police unit parked with its flashing blue lights on the shoulder of the road, does not measure up to the required standard of care for police officers under the circumstances of this case. Here, Trooper Segura not only did not choose the best option of the available methods for blocking the highway (which the law did not require him to do), but he chose an option that was an unreasonable method of performing this extremely dangerous task.
I conclude that Officer Segura's attempting to stop both lanes of traffic on a high speed interstate highway in dark clothing using only a flashlight was a breach of his duty to use reasonable care under the circumstances in performing this inherently dangerous traffic control maneuver. This negligence, combined with the excessive speed and the inattention of the driver of the eighteen wheeler, were concurrent legal causes of this accident.

Scope of Duty Element
There is no dispute that the risk of the injuries sustained by the tort victims was within the scope of protection of the rule of law which imposed the duty on law enforcement officers that was breached in this case.

Conclusion
I would affirm the judgment of the court of appeal, although for different reasons.

APPENDIX
Trooper Segura testified that he waited for a safe gap in the traffic, meaning a distance between him and the nearest approaching car of 1,000 feet or more in the area with a speed limit of fifty-five miles per hour. He then stepped out into the travel lanes in dark clothes with only a flashlight. Since the first approaching car was too close, he did not try to stop that vehicle, but yelled at the speeding driver to slow down and waved his flashlight threateningly as the car passed.
Under Trooper Segura's version, the only oncoming traffic was in the left lane (which was consistent with the testimony of some motorists that they moved into the left lane when they saw, as they crossed the high-rise bridge, the flashing lights of the police unit on the right shoulder), he moved toward that lane signaling with his flashlight above his head until the approaching car began slowing in reaction to the signal. Lowering the flashlight, Segura made eye contact with the driver of the stopping vehicle. He then brought the flashlight back above his head and signaled the next car to a stop in the left lane in the same fashion. Two or three additional cars came to a stop in the left lane "more on their own fromas opposed to just me." The last vehicle to stop was Syrie's Mazda, and the trooper heard the screech of her brakes as she stopped in the left lane. Syrie then moved into the empty right lane. In response to Syrie's lane change, Trooper Segura stepped into the right lane and signaled her to stop. As Syrie brought her car to a second stop in the right lane, about even with the third car in the left lane, the trooper, seeing no more cars approaching within a zone of 1,000 to 1,500 feet, turned with the intention to signal the wrecker driver to begin the turnaround maneuver. Hearing a horn, the trooper turned back and saw an eighteen-wheel tractor-trailer unit just entering the 1,000-to-1,500 foot zone and approaching at "highway speed" in the left lane. Although there was room to stop, according to the trooper, the eighteen wheeler simply moved into the right lane and continued to blow his horn. The trooper then rushed toward Syrie, yelling and waving for her to move out of the way. The eighteen wheeler then struck Syrie's Mazda.
*1182 Four of the drivers who stopped in the left lane testified at trial or by deposition. The first of these drivers (Larson) slowed when he saw the blue flashing lights of the police unit on the shoulder and moved into the left lane. About 200 feet away, he saw Trooper Segura shaking his flashlight at a speeding motorist who swerved around him. In obedience to the trooper's signal, he brought his car to a stop without skidding, although he had to brake fairly hard. He then saw the trooper jump out of the way and saw the Mazda being propelled by the eighteen wheeler past him. He estimated that only two or three seconds elapsed between the time he stopped and the time the Mazda and eighteen wheeler went past him.
A second driver (Hartjes) saw the blue flashing lights when she crossed the high-rise bridge and observed that traffic slowed down. She eventually saw the officer flagging down traffic with a flashlight. When a car swerved around him, she was close enough to hear the officer yell at the driver. The car traveling about three car lengths in front of her stopped, she stopped, and the car behind her stopped. She was able to stop without losing control. "All of a sudden," she heard the squealing of brakes, then she heard the blast of a horn, and then the crash occurred. She did not estimate the period of time between her stopping and the crash.
A third driver (Patin) testified by deposition, but her testimony was totally confused and inconsistent. She stated that she saw the eighteen wheeler in her rear view mirror speeding "out of control" and moved to the left lane, but came to a stop in the left lane behind two or three cars, turned off her motor and air conditioning, and rolled down her window before the eighteen wheeler hit the Mazda behind her. She also stated that several cars came to a stop in the right lane, and the eighteen wheeler pushed the Mazda between the two lines of cars, an impossible situation on a two-lane highway. She added that the events happened quickly. Neither of the lower courts mentioned this witness' testimony.
A fourth driver (Davison) saw the blue flashing lights from the top of the bridge, but the traffic was still flowing and moving into the left lane. She did not recall seeing the trooper, but suddenly noticed the flashing of the brake lights of the cars in front of her "like a domino effect." Although she was able to bring her car to a complete stop, she had to veer slightly to the left and slam on her brakes, causing an infant's swing to fly toward the front of her vehicle. In her rear view mirror, she saw the lights of the small car behind her swerve back and forth and heard the squealing of brakes. She thought she was going to be struck in the rear and lay across her baby in the front seat. The squealing stopped, and she heard a horn. She saw the Mazda on her right, and saw the driver roll back from the sudden stop. The Mazda was then struck by the eighteen wheeler. She described her reactions as the "stop, the lean over, the look [to the right] and the impact," and she expressed the period from when she slammed on her brakes until the time of the impact as "seconds" and "just all in one motion."
JOHNSON, Justice, dissenting.
This multi-vehicular collision occurred on the elevated portion of Interstate-10 over the Atchafalaya Basin, three (3) miles east of the Whiskey Bay Bridge on November 19, 1989 at about 5:30 p.m. (after sundown)
I believe that it was clear negligence for Louisiana State Trooper Segura to attempt to stop the traffic flow on a heavily travelled interstate highway using only a hand held flashlight.
Segura parked his patrol vehicle on the shoulder, with lights flashing, then stepped into the right traffic lane using only the flashlight to stop both lanes of traffic.
In this case, the state trooper breached the duty he owed to plaintiffs to use reasonable care under the circumstances in performing traffic control. His negligence was a cause-in fact of the collision, and when combined with the negligence of the speeding truck driver resulted in plaintiff's injuries.
NOTES
[*] Watson, J., not on panel. Rule IV, Part II, § 3.
[1] 94-957 (La.App. 3d Cir. 3/27/96), 679 So.2d 143.
[2] 96-1027 (La.6/7/96), 674 So.2d 974. An application by plaintiffs was denied. 96-0995 (La.6/7/96), 674 So.2d 974.
[3] Ms. Syrie was not called as a witness because she received head injuries in the accident and has no recollection of the event.
[4] According to Mr. Schilhab's testimony, a "jake brake" slows the engine compression down which in turn slows the truck down without having to put on the brakes.
[1] The testimony of the independent eyewitnesses flatly contradicts that of the state trooper and arguably justifies the court of appeal's conclusion that the trial court's acceptance of the trooper's testimony was manifestly erroneous. Nevertheless, because I conclude that the court of appeal should be affirmed on the basis of a duty-risk analysis, I include a discussion of the testimony on Trooper Segura and four eyewitnesses in an appendix.
[2] The court of appeal concluded that the trooper was negligent in both particulars, but only discussed whether the conduct in blocking both lanes was a cause-in-fact of the injuries.
[3] Plaintiffs also alleged the trooper was negligent in failing to remove Hart from the scene after the initial mishap. The lower courts correctly ruled there was no breach of duty under the circumstances when the trooper instructed the adult woman to stay in a safe place, but did not order her to leave the scene when the local deputy sheriff departed.
[4] The cause-in-fact inquiry does not test whether the trooper was negligent in failing to use flares or the police unit with its flashing blue lights in the traffic lanes. The reach of the cause-in-fact inquiry is whether such use would have prevented the accident, and my determination of that inquiry does not conflict with any express or implied factual findings by the trial judge.
[5] The trial court properly ruled that Trooper Segura was not negligent in blocking both lanes of traffic rather than only the right lane. While arguably it may have been preferable to keep the left lane flowing, particularly since traffic generally was slowing slightly after crossing the high rise bridge and moving into the left lane upon seeing the flashing blue lights ahead, it was not negligent to block both lanes briefly as long as it was done with reasonable care to prevent worsening of the hazards inherent in any blocking of a high speed highway after sundown.