| iPETERS, Judge.
These consolidated personal injury suits arise out of a tragic one-vehicle accident in which Mickey Louis Comeaux and Patricia Deshotel Cormier were rendered quadriplegics. Ms. Cormier, individually and as administrator of the estate of her minor children, filed a petition for damages, naming as defendants Mr. Comeaux, who was the driver of the vehicle, and the State of Louisiana through the Department of Transportation and Development (DOTD). Mr. Comeaux and his wife, Cheryl Comeaux, also filed suit naming only DOTD as a defendant. The eases were ^consolidated, and after trial, the trial court rendered judgment in favor of Ms. Cormier and against Mr. Comeaux, awarding her damages in the amount of $9,578,304.00 and damages in favor of three of Ms. Cormier’s minor children in the amount of $100,-000.00 each and $75,000.00 to a fourth child. All claims against DOTD were rejected by the trial court. Both Ms. Cormier and Mr. Comeaux have appealed that portion of the judgment finding DOTD without fault in causing the accident and resulting injuries.
FACTS CONCERNING THE ACCIDENT
The accident occurred on December 25, 1991, around 3:30 a.m. on U.S. Highway 90, one mile east of Mermentau, Louisiana. At the point of the accident, U.S. Highway 90 is a two-lane, hard-surface highway running generally east and west. A ditch runs parallel to the north side of the highway. Mr. Comeaux, Ms. Cormier, and Patrick Kibo-deaux were traveling west on U.S. Highway 90 on their way to Jennings, Louisiana, when the accident occurred. At that time, Mr. Comeaux was driving, and both Ms. Cormier and Mr. Kibodeaux were asleep.
For an unknown reason, the vehicle exited the travel lane at an angle to the northwest, traversed the highway shoulder, and entered the ditch. The vehicle traveled seventy-four feet before first striking the back slope of the ditch. It traveled another thirty-five feet in the ditch before again striking the back slope and then traveled an additional nineteen feet to its stopping point. Sometime in the process of traversing the ditch, the vehicle overturned. When the vehicle finally came to a stop, it was facing north with the rear bumper twenty feet from the paved surface of U.S. Highway 90.
On the night of the accident, the weather was clear and the road surface was dry and free of visible defects. No skid or gouge marks were found on the paved surface ftthat might suggest a reason that the vehicle left the highway. Expert testimony at trial established that excessive speed was not a factor in causing the accident because the vehicle was traveling at approximately forty-five to fifty miles per hour when it left the highway. The litigants stipulated at trial that at the time of the accident, Mr. Comeaux’s blood-alcohol content was .14 percent based on grams of alcohol per 100 cubic centimeters of blood. However, the eyewitness testimony was to the effect that his driving was not impaired.
Additionally, expert testimony established that in the area of the accident, the roadway had an eleven-and-one-half-foot-wide westbound travel lane and a three-foot-wide unpaved shoulder. The ditch foreslope began immediately adjacent to the shoulder, and the combination of foreslope, ditch bottom, and back slope resulted in a 28.2-foot-wide ditch. The foreslope comprised twelve feet of the 28.2 feet and contained three different slope breaks over the twelve-foot distance. For five feet from the edge of the shoulder, the slope was 3.8:!.[1] For the next five feet, there was a 2.4:1 slope, and for the next two feet, there was a 1.2:1 slope. At this point, the side of the ditch dropped vertically 1.5 feet, or to the bottom of the ditch. The ditch bottom extended 5.7 feet to the beginning of the back slope. The back slope extended the remaining 10.5 feet and was subject to two slope breaks over that distance. For the first 2.5 feet from the bottom of the ditch the slope was 0.7:1. The slope of the final eight *946 feet of the back slope was 1.8:1. A box culvert was located about ten or twelve feet before the area where the tires dropped into the ditch and did not have a guardrail.
The plaintiffs did not attempt to prove that DOTD was responsible for Mr. | ¿Comeaux leaving the travel lane of the highway. Rather, they contended that the shoulder of the highway and the foreslope and back slope of the ditch were defective and that these defects contributed to the severity of their injuries. The trial court found that the for-eslope and back slope of the ditch were dangerous and hazardous to a vehicle leaving the traveled portion of U.S. Highway 90 and that these dangerous and hazardous conditions contributed to the severity of the injuries the plaintiffs suffered. The trial court further found that changing the contours of the shoulder and ditch or adding a guardrail would have, in all probability, lessened the impact and trauma. On appeal, DOTD does not dispute these factual findings. Despite reaching these conclusions, the trial court still denied recovery against DOTD, concluding that DOTD owed no duty to the plaintiffs to remedy or rectify these dangerous and hazardous conditions. Both Mr. Comeaux and Ms. Cormier assign as error the trial court’s conclusion that DOTD owed no duty to them. In this appeal, they request that DOTD be found liable for their damages and that fault be apportioned between DOTD and Mr. Comeaux.
OPINION

Liability

The plaintiffs assert that DOTD’s liability may be found in either the theory of negligence under La.Civ.Code art. 2315 or the theory of strict liability under La. Civ. Code art. 2317. In either case, “liability hinges on whether the defendant has breached his duty to the plaintiff.” Hunter v. Dep’t of Transp. & Dev., 620 So.2d 1149, 1150 (La.1993): In order to determine whether liability exists, a duty-risk analysis is used. Syrie v. Schilhab, 96-1027 (La.5/20/97); 693 So.2d 1173. Under this analysis, the plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the defendant |sbreached the duty, and the risk of harm was within the scope of protection afforded by the duty breached. Id. Under the duty-risk analysis, all four of these inquiries must be answered in the affirmative for the plaintiff to recover. Id. Because the trial court’s conclusion that the condition of the right-of-way was a cause-in-fact of the accident is not contested by DOTD, only the duty issue is before us for review.
Expert testimony presented by the plaintiffs included that of James R. Clary, Sr., an expert in the field of highway design, highway safety, highway signing, land surveying, and hydraulics design; John C. Glennon, a civil engineer; and Duane T. Evans, an expert in the field of accident reconstruction and traffic engineering. Dr. Joseph Blasch-ke, a civil engineer and expert in traffic engineering, highway design, accident reconstruction, and driver behavior within the field of traffic engineering, testified for DOTD.
All of the plaintiffs’ experts were of the opinion that a combination of factors, all within the control of DOTD, created a dangerous situation in the area of the accident. All agreed that the shoulders of the highway as well as the foreslope and back slope of the ditch did not meet acceptable engineering standards. Additionally, they all agreed that the dangerous condition could have been remedied simply by increasing the shoulder width and/or modifying the foreslope of the ditch to a less severe drop or by installing a guardrail.
While generally agreeing that the highway did not meet modern safety standards, Dr. Blaschke was of the opinion that the angle of entry and speed made this accident nonrecoverable. He indicated that in order to make the slope more gentle, the ditch configuration would have to be changed. Dr. Blaschke also testified that a barrier (guardrail) is itself a hazard. The trial court rejected Dr. Blaschke’s analysis and -accepted the opinions of the plaintiffs’ experts in reaching the factual conclusions it |e,did, and DOTD does not contest these factual conclusions on appeal.
*947 As to the remaining questions in the duty-risk analysis, DOTD acknowledges that it owes the motoring public a duty to maintain the state’s highways. La.R.S. 48:21 provides in part that “[t]he functions of [DOTD] shall be to study, administer, construct, improve, maintain, repair, and regulate the use of public transportation systems_” Included is the duty to “adopt minimum safety standards with respect to highway and bridge design, construction, and maintenance.” La.R.S. 48:35(A)(1). Those standards are to correlate with and conform to, as far as possible, the standards approved by the American Association of State Highway and Transportation Officials (AASHTO). Id. Once adopted, DOTD must conform to such safety standards. Id.
The question before us concerns the application of DOTD’s statutory duty to highways constructed prior to the promulgation of more modern construction standards. The original construction on U.S. Highway 90 was completed in June of 1931 in accordance with plans and specifications prepared by the Louisiana Department of Highways (as DOTD was previously known). It was originally constructed as a two-lane, hard-surface highway with nine-foot-wide travel lanes and six-foot-wide shoulders. Thus, the original crown of the highway, i.e., the total width of the highway from shoulder to shoulder, was established in 1931 at thirty feet. The fores-lope of the ditch on the right-of-way extending past the shoulder was to be constructed at 3:1. There is no evidence in the record to indicate that the construction in 1931 was not completed in accordance with design standards existing at the time.
In 1939, the American Association of State Highway Officials (AASHO — now AASHTO) advised the use of guardrails at points of extreme danger and further provided for the use of less-steep slopes to allow a driver an opportunity to regain control of a vehicle which had left the traveled surface. By 1946, both AASHO and |7the Louisiana Department of Highways had issued design standards for rural and urban highways which provided for twelve-foot-wide lanes, eight-foot-wide shoulders, 4:1 to 6:1 foreslopes, and 3:1 back slopes for highways similar to U.S. Highway 90. Obviously, the original construction did not meet these design standards. These 1946 standards were in effect in 1952 when the next major activity took place on U.S. Highway 90 in the vicinity of the accident.
In 1952, a contract was let to widen and overlay the portion of the roadway in question. The project was completed in 1954. The plans and specifications for this project described the type of construction contemplated to be “Widening and Surfacing Existing Concrete Pavement.” The project increased the width of the travel lane to twelve feet without increasing the crown of the highway. This had the effect of reducing the shoulder from six feet to three feet. No work was performed to alter the foreslope of the ditch to meet the existing standards, and a guardrail was not added. Thus, this construction effectively created a three-foot safety zone between the travel lane of the highway and a ditch which did not meet current safety standards. In other words, neither the ditch nor the shoulder met existing safety standards.
Between 1952 and 1969, the Louisiana Department of Highways continued to revise its design standards for rural and urban highways. The October 1955 revision increased the recommended shoulder width to nine feet, and the March 1962 revision recommended a ten-foot-wide shoulder as a minimum. In January 1968, the revision recommended a back slope of 4:1. These were in effect when the next major activity occurred involving the stretch of the highway in the vicinity of the accident.
In April of 1969, additional construction on U.S. Highway 90, described as “AS-PHALTIC CONCRETE PAVEMENT OVERLAY,” was approved by the Louisiana Department of Highways. The plans and specifications provided that the | scontractor retain the twenty-four-foot pavement width and described the shoulder width and fores-lope with the word “Varies.” An asterisk comment appears in relation to the shoulder width and states: “5’ /width used to Compute Shoulder Aggregáte Quantity.” Again, no effort was made to comply with existing standards, and the highway was left with a *948 shoulder and ditch that did not meet accepted construction standards. Construction began on the approved contract in August of 1969, and the work was completed in September of 1970. The record does not reveal that any other changes were made to the area in question prior to the 1991 accident.
As of the time of trial, AASHTO standards provided for 4:1 foreslopes (with 6:1 desirable) and ten-foot-wide shoulders. Additionally, DOTD.design standards provided for eight-foot-wide minimum (ten-foot-wide desirable) shoulders, with 6:1 foreslopes and 4:1 back slopes. Thus, although U.S. Highway 90 was built according to standards applicable in 1931, it did not meet the standards applicable at the time of the accident, except for the width of the travel lanes. The eight-foot-wide minimum recommended shoulder was only three-feet wide; the 6:1 minimum recommended foreslope was 3.8:1; and the 4:1 minimum recommended back slope was, at best, 1.8:1. On the one hand, DOTD has complied with its statutory duty to adopt AASHTO standards, and on the other hand, it has improved, maintained, and repaired U.S. Highway 90 without bringing the highway to modern standards.
Mr. Clary was of the opinion that a combination of conditions created a dangerous situation in the area. Specifically, Mr. Clary found that the shoulder was not wide enough; that the foreslope as a whole was too steep and nonreeoverable, which means that a vehicle is not able to get back onto the road once it gets on the foreslope; that the ditch was unsafe; and that the back slope was too severe. Mr. Clary proposed that the ditch could have been made shallower to provide recoverable slopes |9or that a guardrail could have been installed that would have directed Mr. Comeaux back onto the paved surface.
Mr. Glennon also found that the roadside conditions were hazardous due to the narrow shoulder, steep foreslope and back slope, and violations of numerous design standards. He was of the opinion that once the vehicle left the roadway, the roadside design, prevented recovery and exacerbated the injuries. According to Mr. Glennon, the degree of the sloping at the location of the accident is of the type that is known to -create rollover conditions and to make safe recovery to the roadway very difficult. Mr. Glennon testified' that with some addition of materials, this roadway could be graded to have a flatter, wider ditch and to have slopes that are recoverable. He also testified that another possibility to make this area safe is to add a guardrail.
Mr. Evans was of the opinion that the narrow shoulders were substandard, that the ditch foreslope was steep, and that a clear recovery zone was not provided. He also opined that these design features played a very significant part in causing the accident. In his opinion, the accident would not have occurred if a proper slope had been provided. He testified that if this ditch were three-foot deep, it would allow for between a 4.5:1 and 5:1 slope. He testified that assuming the six- and-one-half-foot ditch depth and configuration were necessary, the DOTD could have installed a guardrail to prevent vehicles from reaching that hazard.
In opposition to this testimony, Dr. Blasch-ke testified on behalf of DOTD that the vehicle speed and angle of entry into the ditch made the accident nonreeoverable, and not the width of the shoulder or the configuration of the ditch. However, no evidence was presented that even suggested that speed was a factor in the accident, and the angle of entry was minimal. After leaving the paved portion of the highway, the vehicle traveled seventy-four feet before striking the back slope of the ditch. The point | ipof impact occurred 20.7 feet perpendicular to the highway. Even assuming that the angle of entry was not increased once the defective foreslope began to pull the vehicle further into the ditch, and using the appropriate trigometrie function,[2] the angle at which the vehicle left the highway was less than seventeen degrees.
As explained by the plaintiffs’ experts, the AASHTO minimum safety standards exist for situations such as this accident. Highway designers must recognize that, for nu *949 merous reasons, a driver may inadvertently leave the travel lane, and they must design highways with this contingency in mind in order to give the driver an opportunity to recover. If the shoulder meets the minimum safety standards, the driver who exits the travel lane to the shoulder has the benefit of the eight-foot-wide shoulder on which to recover. Even when, as in this case, the shoulder does not meet minimum safety standards, a properly-designed foreslope will give the driver additional protection. If the fores-lope is 4:1 or flatter, the driver has a margin of safety in which to regain control of his vehicle. As indicated by the experts, even a 4:1 slope may not allow the driver to recover sufficiently to return directly to the travel lane, but it will allow him to regain control and bring the vehicle safely to a stop. As a vehicle enters a ditch with a foreslope more severe that 4:1, the steeper incline, together with the force of gravity, will pull the vehicle deeper into the ditch and preclude recovery of control. A foreslope which does not meet minimum safety standards is made even more dangerous by a back slope which does not meet minimum safety standards. Even if the shoulder and the foreslope do not meet minimum standards and a vehicle is pulled into the ditch, if the back slope is properly designed, the vehicle may be able to exit on the far side of the ditch under control. However, a vehicle trapped into a ludownward spiral by a too-severe foreslope is destined to collide with an improperly-designed and too-steep back slope. This is exactly the fact situation presented to this court in the accident of December 25,1991. As explained by the experts, the combination of defects basically guaranteed that a vehicle inadvertently leaving the travel lane of U.S. Highway 90, even at a safe speed, would not recover and would ultimately collide with the back slope of the adjacent ditch.
Despite holding that the foreslope and back slope created a dangerous and hazardous condition which contributed to the severity of the plaintiffs’ injuries, the trial court based its decision that DOTD owed no duty to remedy or rectify these dangerous conditions on its interpretation of jurisprudence to the effect that DOTD’s failure to reconstruct roads to meet modern standards does not establish the existence of a hazardous defect. DOTD argues, and the trial court so found, that Myers v. State Farm Mutual Automobile Insurance Co., 493 So.2d 1170 (La.1986), is the applicable standard to be applied in this case. In Myers, the plaintiff lost control of his vehicle, ran off of Louisiana Highway 37 north of Baton Rouge, and struck a large oak tree located in the roadside ditch nine feet from the pavement. At the point where the accident occurred, Louisiana Highway 37 had two twelve-foot-wide lanes, with one to two-foot-wide shoulders. The foreslope of the ditch-at the edge of the shoulder was 2:1. The highway was first paved in 1939, creating two nine-foot-wide lanes. In 1958, each lane was widened by one foot, and three-foot-wide gravel shoulders were added. In 1977, the roadway was again resurfaced, and the lanes were widened by two feet each. The shoulders were not widened, resulting in a twenty-four-foot-wide roadway and one-foot-wide shoulders.
The supreme court concluded that work performed in 1927, 1939, and 1958 complied with all applicable standards then in effect. However, expert testimony | ^established that the 1977 renovations were in technical violation of DOTD standards for overlay and widening of rural roads which required that the horizontal clearance, i.e., the distance between -the roadway and roadside objects measured from the edge of the pavement, be no less after completion of construction than it was before the construction was begun. The lane-widening project obviously violated this standard by reducing the distance between the edge of the pavement and the tree in the ditch. The supreme court noted that while technically the horizontal clearance had decreased, in reality, the distance between the highway and roadside objects had not diminished because the crown of the highway had not been widened, i.e., the edge of the shoulder had not been brought any closer to the tree, and thus the danger to the traveling public had not been increased.
While recognizing that DOTD did violate existing safety standards, the supreme court noted that in order to bring the road into compliance with these standards, the state would have had to acquire a new right-of- *950 way, fill in the roadside ditch, widen each shoulder by four to five feet, dig a new drainage ditch, and remove all obstacles within thirty feet of the roadway. Finding that the physical characteristics of Louisiana Highway 37 were not unique in that many Louisiana roads have narrow shoulders and steep roadside ditches and are lined with trees, culverts, fences, and other objects, the supreme court concluded that the physical and financial burden that would be imposed on the state to bring such roads up to modern standards was an impossible one. The court stated: “For this reason, the failure of DOTD to reconstruct the state’s highways to meet modern standards does not establish the existence of a hazardous defect.” Id. at 1173. Because of the lack of a hazardous defect, the court concluded that DOTD had breached no duty owed to the plaintiff. Id.; see also Mañasco v. Poplus, 530 So.2d 548 (La.1988).
| igThus, the supreme court has made it clear that DOTD has no duty to bring all the highways in the state up to modern construction safety standards. However, design standards alone do not determine whether or not a duty exists, and all the facts and circumstances of each ease must be considered. Hunter, 620 So.2d 1149 (La.1993); Dill v. State, Dep’t of Transp. & Dev., 545 So.2d 994 (La.1989). In fact, DOTD cannot escape liability simply by showing that a highway met existing standards when it was built. Dill, 545 So.2d 994.
In Dill, a collision occurred in a curve of Louisiana Highway 48 in St. Charles Parish, when the plaintiffs were suddenly confronted with a vehicle in their lane. The offending vehicle had been traveling at an appropriate speed when the driver lost control, crossed the centerline, and collided head-on with the Dill vehicle. The trial court concluded that the curvature of the road caused the car to veer into the opposite lane and that this defect was a result of DOTD’s failure to properly maintain the highway. Seventy-two accidents had occurred at this location over the six-and-one-half years prior to the Dills’ accident, and DOTD had been placed on notice of the dangerousness of the curve through numerous citizen complaints. Additionally, there had been numerous requests from the parish governing authority, asking DOTD to take immediate steps to assure motorist safety in the area.
According to the plaintiffs’ expert, the highway was too narrow; the degree of curvature was too severe; the slope was not uniform such that it affected the coefficient of friction and critical speed determination; and the pavement in the curve contained shallow potholes and cracked and worn surfacing. DOTD relied on the Myers decision to request reversal of the judgment against it. Despite the presence of warning devices announcing the danger of the curve, the supreme court found it difficult to conclude that DOTD had fulfilled its duty to the motoring public when it permitted a 114combination of dangerous conditions, consisting of both design and maintenance defects, to exist at one point in a highway, without taking any remedial steps other than installation of warning signs. The court found that the trial court’s decision that the condition of the curve constituted an unreasonable risk of harm which contributed to causing the accident was supported by the record.
We also note that the nature of the duty to bring highways up to modem standards depends on the nature of the changes to the highway in question. If construction activity amounts to major construction resulting in a new roadway, the construction must take into consideration current safety standards. See Hunter, 620 So.2d 1149.
In the instant case, the work DOTD performed in 1952 and 1969 was not major construction or reconstmction as was the case in Hunter. Therefore, the construction alone did not require DOTD to bring U.S. Highway 90 up to current specifications. However, as in Hunter and Dill, the facts herein are more involved than simply the analysis of the construction history.
Of particular importance in this case is the maintenance history of the area involved in this accident. Timothy C. Lejeune is DOTD’s maintenance superintendent responsible for the area of the accident. At the time of trial, he had been employed by DOTD for nineteen years and had served as *951 superintendent for five years. When asked to explain his duty as maintenance superintendent, he stated that he was “[t]o maintain the roads safe for the motoring public.” Although he had taken every training course offered by his employer, he had received no training whatsoever concerning the widths appropriate for shoulder safety and, more importantly, had received no courses or instruction about how a shoulder slope should be maintained. When his deposition was taken prior to trial, he had never heard of the term “foreslope.” No records are | iskept concerning the width and depth of ditches he is responsible for maintaining, and he is supplied with no instruments to check whether the ditches are properly maintained. As to the ditches, Mr. Lejeune testified that his only concern was to keep water off the highway. Although Mr. Lejeune inspected the highways every two weeks, he was not equipped to recognize or repair a ditch that had developed an excessive slope.
Teddy J. Babin, DOTD’s district design water resources and development engineer for the district where the accident occurred, testified that he was aware that part of the design of the foreslope was to “allow one to have a smooth ride and not flip over” and that his district had some that were too steep. However, without referring to a manual, he was not even aware of the current minimum standard for the foreslope. Despite being the design engineer for the district, he explained that the question of whether a ditch met specifications or whether guardrails were needed was outside of his expertise because he considered those questions to be “traffic and planning question[s].”
We disagree with the trial court’s conclusion that DOTD had no duty to keep these areas safe for the motoring public. The highway, shoulder, and ditch are clearly within the control and custody of DOTD. The continuing reconstruction to which U.S. Highway 90 was subjected over the years decreased the margin of safety to the public by narrowing the shoulders without compensating for the now-closer foreslope of the ditch. The narrow shoulder, together with the non-existent maintenance program, created a trap which resulted in the plaintiffs’ severe injuries. Unlike Myers, there was no need to acquire additional right-of-way, or to fill in part of the ditch, or to widen the shoulders (although that would have been one solution), or to dig a new ditch, or to remove an obstacle. All that would have been needed was a proper maintenance | i6program and personnel trained to recognize when a slope needed to be made less severe.
We recognize that DOTD “ ‘is not the guarantor of the safety of travelers thereon or an insurer against all injury or damage which may result from defects in the highway.’” Graves v. Page, 96-2201, p. 12 (La.11/7/97); 703 So.2d 566, 572 (quoting Godwin v. Government Employees Ins. Co., 394 So.2d 751, 755 (La.App. 3 Cir.1981); Laborde v. Louisiana Dep’t of Highways, 300 So.2d 579, 583 (La.App. 3 Cir.), writ denied, 303 So.2d 182 (La.1974)). DOTD argues, based on our holding in Hanehey v. State, Department of Transportation & Development, 597 So.2d 1252 (La.App. 3 Cir.), writ not considered, 604 So.2d 962 (La.1992), that its duty to the public does not extend beyond the shoulder of the road. This argument has been rejected by the supreme court.
As to the area off the shoulder of the road, but within the right of way, DOTD owes a duty to maintain the land in such a condition that it does not present an unreasonable risk of harm to motorists using the adjacent roadway, or to others, such as pedestrians, who are using the area in a reasonably prudent manner.
Oster v. Department of Transp. & Dev., 582 So.2d 1285, 1291 (La.1991).
The supreme court in Graves also recognized that DOTD’s duty extends past the travel lanes. As explained in Graves,
[t]he duty to motorists encompasses the foreseeable risk that, for any number of reasons including simple inadvertence, a motorist might find himself traveling on, or partially on the shoulder. A motorist has the right to assume that a highway shoulder, the function of which is to accommodate motor vehicles in emergencies and for other reasons whether intentionally or un *952 intentionally driven thereon is maintained in a reasonably safe condition.
Graves, 703 So.2d at 572.
The supreme court recently specifically concluded that DOTD has a duty to the motoring public to maintain the side slopes of the right-of-way so that they do not pose |i7an unreasonably dangerous condition. Aucoin v. State Through Dep’t of Transp. & Dev., 97-1938, 97-1967 (La.4/24/98); 712 So.2d 62. It concluded that “DOTD cannot escape liability by claiming that it has no duty to bring [an] old highway up to current standards” when a driver travels off the substandard shoulder into a nonrecoverable slope that has no clear recovery zone. Id. at 66-67.
In the case before us, the reduction of the shoulder width mandated that the foreslope meet specifications to maintain the off-lane safety zone. In this case, DOTD breached its duty to the plaintiffs in this respect and therefore is at fault in causing the plaintiffs’ injuries.

Apportionment of Fault

Having found DOTD at fault, we must apportion fault between Mr. Comeaux and DOTD. In apportioning fault, the fact finder must consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages. Campbell v. Louisiana Dep’t of Transp. & Dev., 94-1052 (La.1/17/95); 648 So.2d 898; Boutte v. Nissan Motor Corp., 94-1470 (La.App. 3 Cir. 9/13/95); 663 So.2d 154. We find that as in Campbell and Boutte, Mr. Comeaux’s negligence set the course for the accident to occur, but Mr. Comeaux’s and Ms. Cormier’s injuries were a direct result of the rollover created by the degree of sloping that existed. Therefore, we assign sixty percent of the fault to DOTD and forty percent of the fault to Mr. Comeaux.

Ms. Cormier’s Damages

The trial court awarded Ms. Cormier damages in the amount of $9,578,304.00, and this award has not been appealed. Therefore, we will not address her damages on appeal. Rather, we consider the issue of damages only for Mr. Comeaux.

Past and Future Loss of Earnings

118In order to recover for actual wage loss, a plaintiff must prove the length of time missed from work due to the tort and must prove past lost earnings. Mathews v. Dousay, 96-858 (La.App. 3 Cir. 1/15/97); 689 So.2d 503. In determining the proper amount to be awarded for future loss of earning capacity, the fact finder should consider the injured person’s age, life expectancy, work-life expectancy, investment income factor, productivity increase, prospects for rehabilitation, probable future earning capacity, loss of future earning capacity, loss of earning ability, and inflation. Myers v. Broussard, 96-1634 (La.App. 3 Cir. 5/21/97); 696 So.2d 88.
Mr. Comeaux had an eighth-grade education and a work history of manual labor including oil field work, in which he had been engaged for the ten to fifteen years prior to the accident. As a result of the accident, Mr. Comeaux was rendered a quadriplegic, having sustained a fracture and dislocation at C6-7 of his cervical spine. According to Dr. Robert D. Franklin, a Lafayette, Louisiana physical medicine and rehabilitation physician who treated Mr. Co-meaux following the accident, Mr. Comeaux is able to flex his right wrist, extend his right elbow, and extend his left wrist. Dr. Franklin testified that in general, Mr. Co-meaux has no use of his hands, upper extremities, or lower extremities. Glen Hebert, Mr. Comeaux’s vocational rehabilitation specialist who was accepted by the trial court as a life care planner and vocational expert, was of the opinion that Mr. Comeaux did not have any skills “to sell” to an employer for sedentary work, noting that he could not test Mr. Comeaux because Mr. Comeaux could not hold a pencil to write. He was of the opinion that Mr. Comeaux was totally and permanently disabled. Based on the foregoing, we find that Mr. Comeaux has no residual earning capacity but is totally and permanently disabled.
Two economists, Dr. Charles Bet-tinger and Dr. Ken Boudreaux, testified concerning Mr. Comeaux’s loss of earnings. Dr. Bettinger testified on behalf of Mr. *953 | igComeaux, and Dr. Boudreaux testified on behalf of DOTD. Mr. Comeaux demonstrated an earning capacity of $24,661.00 through his 1990 income tax return, and this figure was used by both experts in making their calculations. While there was some question at trial about lower earnings in 1989 as well as in 1991, the year of the accident, we note that an award for loss of future earning capacity is not based merely on the difference between the injured person’s preaccident and postaccident wages but should be based on the difference between the injured person’s earning capacity before and after the accident. See id. Therefore, we find no error in the use of $24,661.00 as the proper base to be used in calculating the loss of earning capacity. At the time of the accident, Mr. Co-meaux was thirty-three years old, and at the time of trial, he was thirty-six years old. Dr. Bettinger calculated the past loss of earnings to be $85,401.00. This calculation was derived by multiplying $24,661.00 by 3.463, being the number of years between the accident and trial. Dr. Boudreaux calculated the loss to be $87,084.86. The difference in the calculations was based on Dr. Boudreaux’s use of 3.5 years between the accident and trial instead of 3.463.
Dr. Bettinger calculated Mr. Comeaux’s future loss of earnings to be $650,691.00 based on an earning capacity of $24,661.00; a fringe-benefit, package of fifteen percent, which Dr. Bettinger testified is the minimum amount mandated by law; a full-time work-life expectancy of 24.4 years under the U.S. Department of Labor statistics; and a net below-market rate, or a real interest rate, of two and one-half percent. Dr. Boudreaux calculated future loss of earnings to be a minimum of $322,081.81 or a maximum of $424,743.34, with a midpoint of $373,412.56. The principal difference between Dr. Bou-dreaux’s calculations and those of Dr. Bet-tinger arises because Dr. Boudreaux failed to include fringe benefits in his calculations. However, Dr. Boudreaux admitted that if Mr. Comeaux were not able to return to any hotype of gainful employment, he would lose fringe benefits if he were a full-time, steady employee. Another factor which affected Dr. Boudreaux’s calculations is that he used a work-life expectancy as of the time of the accident and then deducted the 3.5 years between the accident and trial to derive a future work-life expectancy for loss of future earnings of 21.6 years. Dr. Bettinger’s future work-life expectancy calculation was based on Mr. Comeaux’s age at the time of trial.
We conclude that Dr. Bettinger’s calculations are the appropriate ones to use in this case, and based on those calculations, we award damages for loss of past and future earnings in the amount of $736,092.00.

Life Care Plan

Dr. Franklin testified that Mr. Co-meaux is wheelchair bound, has a neurogenic bladder, and requires assistance for such things as grooming and hygiene. He was of the opinion that Mr. Comeaux will have complications, including some bladder problems, contractures, cardiovascular problems, and vascular problems. According to Dr. Franklin, Mr. Comeaux needs custodial care twenty-four hours a day.
Dr. Franklin met with Mr. Hebert to review a life care plan for Mr. Comeaux, and Dr. Franklin ultimately signed off on the plan. The life care plan itemized expenses associated with evaluations, therapeutic modalities, wheelchairs, maintenance, home furnishings and accessories, home care, future medical care, transportation, medical supplies, architectural renovations, and potential complications. According to Mr. Hebert, the life care plan for Mr. Comeaux contained “the bare mínimums that this person needs.” Dr. Bettinger calculated the present value of the projected cost of Mr. Hebert’s life care plan to be $3,851,309.00.
Dr. John William Grimes, DOTD’s expert in vocational and rehabilitation counseling, also formulated a life care plan for Mr. Co-meaux. However, Dr. Grimes’ bilife care plan was not based on twenty-four-hour-a-day custodial care, as recommended by Dr. Franklin, but on twelve-hour-a-day custodial care. Additionally, he did not consult with Dr. Franklin or any other physician in connection with his life care plan. On behalf of DOTD, Dr. Boudreaux calculated the life care plan costs based on Dr. Grimes’ plan to be $1,097,292.00, based on a four percent net *954 discount rate, and $1,696,700.00, based on a one percent net discount rate. Dr. Bou-dreaux’s calculations did not include amounts for expected medieal/surgical interventions, as set forth by Dr. Grimes, and he explained that no economist could calculate that item without knowing when the expenses would occur.
We conclude that the life care plan submitted by Mr. Hebert, approved by .Dr. Franklin, and calculated by Dr. Bettinger provides the appropriate measure of damages for this item of recovery. Therefore, we award damages of $3,851,309.00 for the life care plan for Mr. Comeaux.

General Damages

Prior to the accident, Mr. Comeaux enjoyed fishing, camping, and playing ball with his son. Mr. Comeaux’s wife, Cheryl, described him as “always energetic, always on the go.” As a result of the accident, Mr. Comeaux was rendered a quadriplegic and is wheelchair bound. According to Mr. Co-meaux, he has experienced painful spasms, in which he will “straighten out and [his] legs will go wild or they will kick out of the bed”; bladder infections; and bed sores. He wears a belly band to help him breathe. Mrs. Comeaux described her husband as “always a patient person,” but she testified that following the accident, her husband is very impatient and depressed. Considering the severity and permanency of Mr. Comeaux’s condition as well as the effect of the injury on him, we award Mr. Comeaux general damages in the amount of $3,500,000.00.
I22L0SS of Consortium
The compensable elements of damage in a claim for loss of consortium of a spouse include loss of love and affection, loss of- companionship, loss of material services, loss of support, impairment of sexual relations, loss of aid and assistance, and loss of felicity. Ferrell v. Fireman’s Fund Ins. Co., 96-3028 (La.7/1/97); 696 So.2d 569. As of the time of trial, Mr. and Mrs. Comeaux had been married for seventeen years. Mrs. Co-meaux testified about the effect that the accident had on the couple’s marital relations and social life and about her responsibilities for caring for her husband’s needs. We find an award of $100,000.00 for loss of consortium to be appropriate under the circumstances of this case.
DISPOSITION
For the foregoing reasons, we reverse the judgment of the trial court. We assess forty percent of the fault to Mr. Comeaux and sixty percent of the fault to DOTD in causing the accident. We award Mr. Comeaux $736,092.00 for total loss of earnings; $3,851,309.00 for the life care costs; and $3,500,000.00 for general damages, for a total damages award of $8,087,401.00. We award Mrs. Comeaux $100,000.00 for loss of consortium. We assess costs of this appeal to DOTD.
REVERSED AND RENDERED.
DECUIR, J., dissents and assigns written reasons.
AMY, J., dissents.

. The slope defines the angle at which the ditch deepens by comparing the degree of drop in depth with the horizontal distance traversed. Thus, a 3.8:1 slope describes an angle wherein the ditch has descended to a depth of one foot over a horizontal distance of 3.8 feet.

. By the use of these established measurements, one can calculate the sine of the angle of entry to be 0.27973. This approximates to an angle of 16°15'.