774 So.2d 208 (2000)
Clayton NUNEZ, et ux.
v.
COMMERCIAL UNION INSURANCE CO., et al.
No. 00-106.
Court of Appeal of Louisiana, Third Circuit.
August 23, 2000.
Opinion Granting Rehearing in Part and Denying Rehearing in Part October 4, 2000.
Writs Denied February 16, 2001.
*210 Raleigh Newman, Donald W. McKnight, Lake Charles, Louisiana, Counsel for Plaintiff/Appellees.
Robert M. Mahony, Greg R. Mier, Lafayette, Louisiana Counsel For Defendants/Appellants Earl J. Hoffpauir and American Insurance Company (erroneously referred to as Commercial Union Insurance Company).
M. Steven Beverung, Lake Charles, Louisiana, Counsel For Defendants/Appellants Calcasieu Parish Sheriff's Office and Coregis Insurance Company.
Adam L. Ortego, Assistant Attorney General, Lake Charles, Louisiana, Counsel For Defendants/Appellants State Of Louisiana, Dept. of Public Safety and Corrections.
Court composed of Judge OSWALD A. DECUIR, Judge MICHAEL G. SULLIVAN, Judge GLENN B. GREMILLION.
*211 GREMILLION, Judge.
The defendant, the State of Louisiana, Department of Public Safety and Corrections (DPSC), appeals the judgment rendered by the trial court following a jury's verdict in favor of the plaintiffs, Clayton and Lillian Nunez. For the following reasons, we affirm the judgment as amended.

FACTS
Louisiana Highway 385 (Gulf Highway) intersects with Louisiana Highway 3092 (Gauthier Road), south of Lake Charles, near the Burton Coliseum in Calcasieu Parish. On May 20, 1996, two accidents occurred at that intersection. The first accident rendered the traffic lights at the intersection inoperable. The first law enforcement personnel on the scene of this accident was a deputy with the Calcasieu Parish Sheriffs Department, who immediately commenced directing traffic through the intersection. This accident was investigated by troopers with the Louisiana State Police, who arrived shortly after the deputy. The second accident occurred before the traffic lights could be restored to operation. At the time of this accident, no one was directing traffic through the intersection. There is controversy over the question of who controlled the intersection at the time of the second accident. The state troopers allege that the deputy left the intersection before they could assume control. The deputy alleges that he turned control of the intersection over to the state troopers before he left the scene to continue his criminal patrol. This appeal concerns the second accident.
At approximately noon on May 20, 1996, Clayton was driving a 1988 Lincoln sedan south on Gulf Highway, with Lillian as his passenger. Garrett Hoffpauir, the minor son of Earl Hoffpauir, was traveling east on Gauthier Road in his father's 1991 Chevrolet truck. Both vehicles entered the intersection at the same time and collided. The collision caused the Nunezes' vehicle to eventually land on its side in a ditch located on the west side of Gulf Highway, south of the intersection.
As a result of this accident, the Nunezes filed suit against the State, through the DPSC, the Calcasieu Parish Sheriffs Department (Sheriff's Department) and its insurer, Coregis Insurance Company, and Earl Hoffpauir and his insurer, American Central Insurance Company. After numerous procedural maneuvers, including cross claims and interventions, the Nunezes filed a Motion to Reduce Demand for Damages. They claimed that Clayton's damages did not exceed $50,000; thus, he moved to have his claims tried as a bench trial. After hearing argument on the motion, the trial court granted the motion and Clayton entered a stipulation that his damages were less than $50,000 and that he was not seeking a judgment over that amount. Writs were sought on this issue by the Sheriff's Department and American Central Insurance. In an unpublished opinion, this court held that Clayton's and Lillian's claims were cumulated and should be tried together by a jury; thus, the trial court erred in ordering Clayton's claims tried by a bench trial even though he had declared his damages to be less than $50,000. Nunez v. Commercial Union Ins. Co., an unpublished writ 98-1087, 98-1095 (La.App. 3 Cir. 7/21/98).
A jury trial was held in this matter between May 4-7, 1999. Following the presentation of evidence, the jury returned a verdict in favor of the Nunezes, finding DPSC 100% at fault in causing the accident and awarding damages as follows:

 Clayton Nunez
1) Past medical expenses: $ 31,696.90
2) Physical and mental pain, suffering,
 and loss of enjoyment of life: $250,000.00
3) Disability: $ 75,000.00
 Lillian Nunez
1) Past medical expenses: $ 21,561.64
2) Future Medical expenses: $ 54,000.00
3) Attendant Expenses: $ 2,079.70
4) Physical and mental pain, suffering,
 and loss of enjoyment of life: $250,000.00
5) Disability $ 75,000.00

Upon presentation of a proposed judgment, the Nunezes filed a Motion to Have Plaintiffs' Proposed Judgment Signed, *212 seeking to have the damages awarded to Clayton by the jury included in the judgment. DPSC countered with a Rule to Show Cause why its judgment awarding Clayton less than $50,000, should not be signed. Following a hearing on the rule, the trial court ordered Clayton's stipulation withdrawn as of the date of filing, June 10, 1999, and ordered the Nunezes' proposed judgment signed. After judgment was rendered in this matter, DPSC filed a Motion for Judgment Notwithstanding the Verdict and/or New Trial, both of which were denied. This appeal followed.

ISSUES
DPSC raises five assignments of error on appeal. It argues:
1) The trial court erred in allowing Clayton to withdraw his stipulation, that his damages would not exceed $50,000, after the trial.
2) The jury erred in apportioning 100% of the fault to DPSC, and in failing to assign comparative fault on the part of Clayton, Garrett Hoffpauir, and the Sheriff's Office.
3) The trial court erred in awarding Lillian damages in the amount of $402,641.34.
4) The trial court erred in awarding damages to Clayton in the amount of $356,696.90.
5) The trial court erred in not requiring Lillian's award for future medical expenses to be paid in accordance with La.R.S. 13:5106(B)(3), via a reversionary trust.

STIPULATION
In its first assignment of error, DPSC argues that the trial court erred in allowing Clayton to withdraw, after trial, his stipulation as to the amount of damages he was seeking.
At the June 18, 1998 hearing on Clayton's Motion to Reduce Demand for Damages, counsel for Clayton stated:
For the record, Your Honor, I will stipulate as Mr. Clayton Nunez's attorney that we have reduced our demands to less than $50,000, and that we do not seek any judgment over and above $50,000; that we understand that any judgment the Court should render could not be above $50,000.
The Nunezes argue that the stipulation was not binding on them because none of the defendants relied on it to their detriment.
In R.J. D'Hemecourt Petroleum v. McNamara, 444 So.2d 600, 601 (La.1983), cert. denied, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 39 (1994) (footnotes omitted), the supreme court stated, "A stipulation has the effect of a judicial admission or confession, which binds all parties and the court. Stipulations between the parties in a specific case are binding on the trial court when not in derogation of law. Such agreements are the law of the case."
Pursuant to La.Civ.Code art. 1853, "[a] judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it. A judicial confession is indivisible and it may be revoked only on the ground of error of fact." A judicial confession waives the introduction of evidence as to the subject matter of the admission or withdraws the matter from issue. However, the effect of a judicial admission will only be imposed if the other party relied on it to their detriment or were led to believe that the fact was not at issue. If there is no detrimental reliance, the party submitting the judicial confession may be allowed to withdraw it. Fisher v. River Oaks, Ltd., 93-677 (La. App. 5 Cir. 3/16/94); 635 So.2d 1209, writ denied, 94-0932 (La.6/3/94); 637 So.2d 503.
In allowing Clayton to withdraw the stipulation, the trial court gave four reasons for finding that the stipulation was not binding. First, it stated that the stipulation should be revoked on the ground of error of fact, because Clayton's injuries were progressively getting worse. The *213 trial court's second and third reasons were that DPSC failed to object to the introduction of evidence and that it suffered no detrimental reliance, especially in view of the fact that Clayton offered to settle the case for $150,000 prior to trial and none of the defendants objected to that amount based on the stipulation. Finally, the trial court stated that it had a problem with the defendants asking for a jury trial, getting the jury trial, and then not going along with the amount awarded.
We find no error in the trial court's decision allowing Clayton to withdraw the stipulation. There is nothing in the record evidencing that any of the defendants objected to the introduction of evidence pertaining to Clayton's injuries during the trial, or that they attempted to limit the jury's potential award to less than $50,000 based on the pre-trial stipulation. Clayton further argued that none of the defendants objected to his $150,000 settlement offer based on the stipulation. Since DPSC neither detrimentally relied on this evidence nor was misled to believe that the fact was not at issue, we find that the trial court correctly allowed Clayton to withdraw the pre-trial stipulation and ordered his proposed judgment signed. This assignment of error is dismissed as being without merit.

FAULT
In its second assignment of error, DPSC argues that the jury erred in apportioning it with 100% of the fault in causing the accident. It would have us find that it was not at fault in causing the accident and that comparative fault should be allocated to the Sheriffs Department, for leaving the intersection unsecured, and to both Garrett and Clayton, for entering the intersection without first determining that it was safe to do so.

Testimony Pertaining to Accident
Deputy Luke Pierotti testified that he arrived after the first accident, parked his patrol car near the center of the intersection, and began directing traffic from the northwest quadrant of the intersection because the traffic lights were knocked out by the accident. He testified that Troopers Gray and Bergeron arrived at the scene approximately thirty minutes later and commenced investigating the accident. When the intersection was cleared, approximately one and a half hours later, Deputy Pierotti testified that he waited until there was no traffic approaching before asking the state troopers to take control of the intersection. He stated that he walked around his patrol car towards Trooper Gray, who was approximately fifty feet from him in the southwest quadrant of the intersection talking to a young man. When he was approximately twelve feet away, he asked Trooper Gray, "Do y'all have it?"and that Trooper Gray replied, "We got it. Thanks."
Deputy Pierotti testified that he entered his patrol car and drove into the parking lot of the Burton Coliseum and stopped next to Trooper Bergeron, who was sitting in her unit located approximately seven to eight feet from the shoulder of the parking lot's corner. He stated that he asked her, "Do y'all have it?" and that she replied, "Yes." He further told her, "Make sure DOT knows about the light being down," to which she replied, "Our office will take care of that." When he drove his patrol car east on Gauthier Road, Deputy Pierotti stated that he did not see either trooper directing traffic in the intersection. He stated that he was approximately 300 yards away when he saw the cloud of dust caused by the Hoffpauir-Nunez collision in his rear view mirror. Upon seeing that, he testified that he turned around and returned to the intersection. When he arrived back at the scene, he testified that he saw Trooper Gray and the man he was talking to running towards the vehicle in the ditch.
Deputy Pierotti testified that he received a call from Trooper Bergeron later that night. He stated that she was upset because she had been told to alter the report to make it appear as though he *214 had left the scene just prior to the second accident. He further denied making a statement at the accident scene that he felt it was insignificant that he was not directing traffic at the time the accident occurred. He further denied acting concerned about whether his name would appear in the accident report.
Deputy Pierotti testified that Sheriffs Department policy requires deputies arriving at the scene of an accident to direct traffic until the proper traffic authority is notified. Once those authorities arrive, he stated that he is free to leave the scene, unless he was asked to assist with the investigation. Deputy Pierotti testified that the State Police controls the scene of accidents occurring on state highways, and that he has no authority to investigate such accidents. He stated that his main function was criminal patrol. Deputy Pierotti testified that he would not have left the intersection unattended had Troopers Gray and Bergeron not indicated that they were in control. He further testified that there was no doubt in his mind that Trooper Gray understood that he was leaving the intersection.
Trooper Chris Gray testified that Deputy Pierotti was directing traffic at the intersection of Gulf Highway and Gauthier Road when he and Trooper Bergeron arrived after the first accident. Sometime thereafter, he testified that he and Trooper Bergeron were sitting in their unit, which was parked approximately 100 yards from the intersection, doing paper work when Deputy Pierotti approached them. Trooper Gray stated that he got out of the vehicle and spoke to Deputy Pierotti, who informed him that he needed to leave. Trooper Gray stated that he told Trooper Bergeron to drive their vehicle to the intersection and then he started walking towards the intersection. Moments later, he testified that he saw the collision occur when Garrett's truck, which was traveling east on Gauthier Road at approximately twenty miles per hour, struck the Nunezes' Lincoln, which was traveling south on Gulf Highway at approximately fifty to fifty-five miles per hour. Trooper Gray testified that he did not believe that Deputy Pierotti could have left the scene when the accident occurred since it happened moments after he asked permission to leave.
Trooper Gray testified that he spoke with Garrett at the scene and with the Nunezes at the hospital, but admitted that he did not take their statements for the accident report. He further admitted that he was not listed as a witness to the accident in the accident report, which he described as an oversight on his part. He further testified that he did not obtain a statement from the tow truck driver, who also witnessed the accident. Trooper Gray explained that he was Trooper Bergeron's training officer and that she was a trainee at the time of this accident. He stated that both he and Trooper Bergeron wrote the accident report since she was unsure how to begin the report.
Trooper Gray testified that the State Police are charged with the duty of investigating accidents occurring on state highways such as Gulf Highway. He further stated that traffic should be directed when a traffic light is inoperative either until stop signs are placed at the intersection or power is restored and the lights are functioning again. Trooper Gray explained that it was important for traffic to be directed at such intersections in order to prevent further accidents. He testified that a sign warning oncoming motorists of the traffic light ahead was located some distance north of the intersection, and that Clayton would have passed this sign prior to approaching the intersection. Trooper Gray stated that drivers approaching an intersection where the traffic lights are inoperable should yield to vehicles approaching the intersection from the right at the same time and proximity.
Trooper Anita Bergeron testified that Deputy Pierotti was directing traffic when she and Trooper Gray arrived at the scene of the first accident. Although she did not remember where they parked their unit *215 upon arriving at the scene, she remembered moving it to the northwest corner of Burton Coliseum's parking lot after one of the cars involved in the accident was moved there by a tow truck. She stated that their vehicle was parked back from the edge of the parking lot, which was located approximately forty feet from the edge of Gulf Highway. Trooper Bergeron testified that, at some point, while she was talking to Trooper Gray in the parking lot, Deputy Pierotti pulled up next to them in his patrol car and told them that he was leaving because he had received another call. She testified that he was still there when they heard the Hoffpauir-Nunez collision. In her deposition, Trooper Bergeron testified that she could not remember where Deputy Pierotti was when the second accident occurred; however, during her testimony, she stated that she did not think he had left the parking lot. Although she testified that she did not talk to Deputy Pierotti while he was next to them, Trooper Bergeron remembered being surprised when he drove up next to their unit, because that meant there was no one directing traffic in the intersection. After the collision, she testified that she exited their vehicle and ran toward the intersection.
Trooper Bergeron stated that she had been with the State Police for six months when the accident occurred and that a course in accident investigation at the Police Academy included instruction in preparing accident reports. She stated that she had investigated one to two accidents per day during her training period and was aware that she should identify witnesses to an accident in order to obtain an independent account of the accident. Trooper Bergeron testified that she did not recall Trooper Gray telling her that he was a witness to the accident. She further admitted that the accident report did not contain statements by the tow truck driver, Garrett, or Clayton.
Trooper Bergeron also admitted calling Deputy Pierotti the night of the accident, but explained that she did so to tell him that his name was in the accident report. She stated that she called because she recalled him saying that it was insignificant that he was not directing traffic at the time the accident occurred because both drivers should have treated the intersection as a four-way stop. She denied telling him that she was ordered to write the accident report so that it appeared that he left the scene without being relieved. Trooper Bergeron further stated that she did not recall telling Deputy Pierotti that they had control of the intersection. She stated that Deputy Pierotti had already left the intersection when he asked to be relieved.
Garrett testified that he was traveling east on Gauthier Road towards his father's house when the accident occurred. As he approached the intersection, he stated that he noticed that the traffic lights were not working, but that he did not see anyone directing traffic. At approximately twenty feet from the intersection, he testified that he slowed down and looked towards the left where he saw a vehicle approximately 75 to 100 yards away. When he reached the intersection, Garrett testified that he treated it as a four-way stop. He stopped and looked right, noticing three to four vehicles approximately two hundred or more yards away. Without checking traffic to his left again, he shifted his truck into low gear and proceeded through the intersection. He was a couple of feet into the intersection when the vehicle traveling south on Gulf Highway struck the front end of his truck. He stated that he was able to hit his brakes before the collision.
Garrett testified that he did not see a deputy or patrol car in the intersection or the Burton Coliseum parking lot and that he saw a state trooper in the northwest corner of the Burton Coliseum parking lot, next to a tow truck. He testified that he was traveling approximately five miles per hour when he entered the intersection. Garrett explained that he did not check *216 the traffic to his left before entering the intersection because he assumed that the vehicle would treat the intersection as a four-way stop and yield to him. Garrett testified that the state troopers never questioned him about the accident. He denied that he was traveling at twenty miles per hour as he entered the intersection. He further stated that the accident would never have happened if the state police had been directing traffic.
Clayton testified that he and his wife were following a line of traffic south on Gulf Highway when the accident occurred. He stated that a dark colored car was a couple of car lengths ahead of his vehicle. As they approached the intersection, he testified that Lillian remarked that the traffic light was not working, but that he replied that the lights were only used when events were held at the coliseum. When he entered the intersection, Clayton testified that his vehicle was struck on the rear passenger side, which caused it to spin around and eventually come to a rest on the driver's side in a ditch.
Clayton admitted that he did not recall seeing the warning sign prior to entering the intersection. If he had known that the traffic lights at the intersection were not working, he testified that he would have treated the intersection as a four-way stop. Clayton further testified that none of the vehicles ahead of him stopped at the intersection, and that he was just following the line of traffic.
Clayton testified that a male state trooper talked to him while he was in the emergency room and told him that he was not at fault in causing the accident. He stated that the trooper told him, "It's our fault," because they were not flagging the traffic in the intersection.
Lillian testified that she noticed the traffic lights were out at the intersection of Gulf Highway and Gauthier Road. Even though she pointed this out to Clayton, she stated that he told her that the lights were only used when there was a rodeo at the coliseum. Lillian testified that they were following the traffic on the highway and that they did not see any other vehicle stop at the intersection. She stated that they were almost through the intersection when they were hit from the back, causing their vehicle to spin twice before coming to rest on its side in a ditch. She testified that a police officer visited them at the hospital and told Clayton that neither he nor Garrett was in the wrong because the officers should have been directing traffic at the intersection.
Noel Williamson, the owner of Cotton's Towing and Recovery, arrived after the first accident and stated that a deputy was directing traffic at the intersection. He stated that he moved one of the vehicles involved in the accident into the Burton Coliseum parking lot and then helped the second tow truck hook up the other vehicle. Williamson testified that the deputy was still directing traffic when he began picking up debris from the accident scene. He stated that he first noticed that the deputy was no longer directing traffic when a vehicle passed very close to him. He looked to see who was directing traffic and saw the deputy walking back toward his patrol car. Williamson testified that he did not hear the deputy say anything to him or anyone else before leaving. At that point, he stated that he stopped picking up debris because it was no longer safe.
Williamson testified that the crash occurred a minute or two later while he was walking back to his truck. He stated that he heard the crash and tires squealing behind him so he started running and then turned and looked back after a few steps. He testified that he saw a Lincoln slide and then come to rest on its side in a ditch located on the west side of Gulf Highway. Williamson stated that he turned and ran back toward the Lincoln to check on its passengers and that the state troopers reached the vehicle shortly after he did. Williamson stated that he believed the state troopers and their unit were already *217 in the coliseum parking lot when the crash occurred. He did not recall seeing them in the intersection or on the perimeter of the road while he was picking up debris. He was not sure if the deputy talked to the state troopers before leaving the scene.
Williamson testified that he saw Garrett bring his vehicle to a complete stop at the intersection, but that the vehicles traveling south on Gulf Highway did not appear to be slowing down. He stated that no one was controlling the intersection when the accident occurred. Williamson further stated that he was not asked to give a statement about the accident by the state troopers, and that he would have given one if requested.
The parties stipulated that Steven Jiles, the District Traffic Operations Engineer with the Department of Transportation and Development, would have testified that the warning light located north of the intersection, was on a different circuit than the traffic lights knocked out at the intersection. He further would have testified that DOTD received no reports concerning the malfunction of the warning light.
In determining liability, the courts of this state have employed a duty-risk analysis. This approach requires proof of five elements before liability can be imposed on a defendant:
(1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant's substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element).
Fowler v. Roberts, 556 So.2d 1, 4 (La.1989).
The first inquiry in the duty risk-analysis is cause-in-fact. Cause-in-fact is a "but for" inquiry, that is, if the plaintiffs harm would not have occurred but for the defendant's substandard conduct, then it is a cause-in-fact. When multiple causes are present, a defendant's conduct is a cause-in-fact when it is a substantial factor in generating a plaintiffs harm. Shephard v. Scheeler, 96-1690, 96-1720 (La.10/21/97); 701 So.2d 1308; Dixie Drive It Yourself v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962). In determining whether a duty exists on the part of the defendant, "[t]he particular facts and circumstances of each individual case determines the extent of the duty and the resulting degree of care necessary to fulfill that duty." Cormier v. T.H.E. Ins. Co., 98-2208, p. 7 (La.9/8/99); 745 So.2d 1, 7 (citation omitted). The duty-risk analysis is also applied in most cases alleging negligence on the part of a public body. Id.
A trial court's finding of fact will not be reversed in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). In Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993), the supreme court laid out a two-part test for the reversal of a trial court's or jury's findings of fact: "(1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous)."
After reviewing the record, we find that it was unreasonable for the jury to determine that DPSC was solely liable in causing this accident.
The liability of the officers and the drivers will be discussed separately.

Officers

A. Cause-in-Fact Element
After reviewing the evidence, we find that it was reasonable for the jury to find that the conduct of Troopers Gray and Bergeron, in failing to take control of the *218 intersection immediately after Deputy Pierotti asked to be relieved, was a cause-in-fact of the accident occurring. However, it was unreasonable for the jury to conclude that the actions of Deputy Pierotti in leaving the intersection unmanned were not a cause-in-fact of the accident. Both of these actions were a substantial factor in causing the collision between the Nunezes and Garrett.

B. Duty Element
In Syrie v. Schilhab, 96-1027, p. 5 (La.5/20/97); 693 So.2d 1173, 1177, the supreme court stated that law enforcement officers have the exclusive power to regulate traffic and are bound to exercise this duty in a reasonable manner so as to protect "life and limb and to refrain from causing injury or harm."
When a law enforcement officer becomes aware of a dangerous traffic situation, he has the affirmative duty to see that motorists are not subjected to unreasonable risks of harm. Monceaux v. Jennings Rice Drier, Inc., 590 So.2d 672, 675 (La.App. 3d Cir.1991). In Mathieu [v. Imperial Toy Corp.], 94-0952 at 10 [(La.11/30/94);] 646 So.2d [318,] 325, this court stated that the scope of an officer's duty is to choose a course of action which is reasonable under the circumstances. In other words, the scope of an officer's duty to act reasonably under the circumstances does not extend so far as to require that the officer always choose the "best" or even a "better" method of approach.
Id.
Both Troopers Gray and Bergeron and Deputy Pierotti had a duty to direct traffic at this intersection in a manner which would not expose motorists to an unreasonable risk of harm.

C. Breach of Duty Element
Testimony was presented at the hearing from which the jury could have reasonably deduced that the state troopers breached their duty. This includes Deputy Pierotti's testimony that Trooper Gray was fifty feet from where he was directing traffic in the intersection when he asked to be relieved, that both Troopers Gray and Bergeron affirmed that they had control of the intersection, but that neither were directing traffic when he left the scene. Other evidence supporting the jury's finding was Garrett's testimony that he did not see either Deputy Pierotti or his patrol car as he neared the intersection, and that he saw a state trooper in the parking lot. Finally, the jury heard testimony from both Clayton and Lillian that the state trooper told Clayton that the accident was his fault since they were not directing traffic in the intersection at the time the accident occurred. Considering this evidence, we cannot say that the jury erred in finding that Troopers Gray and Bergeron breached their duty to use reasonable care in the directing of traffic through the intersection.
Of all the parties involved, Deputy Pierotti could most easily have prevented the accident from occurring by remaining in the intersection and continuing to direct traffic until either Trooper Gray or Bergeron physically took his place. Williamson testified that he did not hear the deputy speak to anyone before leaving the intersection. Since Deputy Pierotti could easily have prevented this accident by remaining on station a few minutes longer, we find that Deputy Pierotti breached his duty to use reasonable care under the circumstances.

D. Scope of Protection Element
In LeBlanc v. Stevenson, 99-885, p. 9 (La.App. 3 Cir. 12/22/99); 756 So.2d 356, 362, this court stated:
This prong of duty/risk has also been called legal causation. Legal causation "requires a proximate relation between the actions of a defendant and the harm which occurs and such relation must be substantial in character." Roberts [v. Benoit, 605 So.2d 1032,] 1056 [(La. *219 1932)] quoting Sinitiere v. Lavergne, 391 So.2d 821, 825 (La.1980). In Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, 622 (1972), the supreme court endorsed an ease of association test which asks how easily the risk of harm can be associated with the rule which was breached.
Under the facts of this case, there can be no doubt that Troopers Gray and Bergeron and Deputy Pierotti owed a duty to both the Nunezes and Garrett to protect them from colliding at this intersection. Thus, the risk of harm which faced the drivers as they entered the intersection can easily be associated with the officers' breach of their duty.

Garrett and Clayton
Employing the duty-risk analysis, we find that it was unreasonable for the jury to find both Garrett and Clayton free from fault in causing this accident.

A. Cause-in-Fact Element
We find that Garrett's and Clayton's actions in proceeding through the intersection were a cause-in-fact of the accident. Even though Garrett knew that a vehicle was approaching the intersection from his left, he proceeded through the intersection after stopping, because he assumed that vehicle would treat the intersection as a four-way stop and yield to him. But for his actions in proceeding into the intersection, this accident would not have occurred. Likewise, Clayton proceeded through the intersection without first determining that it was safe to do so. Even though he knew that the traffic light was out, he simply followed the line of traffic ahead of him and proceeded through the intersection without slowing down. His actions are not excused because the vehicle he was following failed to stop at the intersection and because he believed that the traffic lights were only employed during an event at the Burton Coliseum. Thus, we find that both Garrett's and Clayton's actions were a substantial factor in causing the accident.

B. and C. Duty Element and Breach of Duty Element.
In Soprano v. State Farm Mutual Automobile Insurance Co., 246 La. 524, 534-35, 165 So.2d 308, 312 (1964), the supreme court discussed the duty owed by a motorist who is entering an intersection where the traffic lights are inoperable:
A non-functioning, four-sided semaphore signal device at an intersection in plain view of an ordinary observant motorist imposes a duty of extreme caution on any motorist approaching or entering that intersection. To enter such an intersection without slowing down or stopping to ascertain whether the crossing can be negotiated in safety is imprudent and constitutes negligence in legal contemplation.
Thus, Garrett and Clayton both had a duty not to enter the intersection until they determined that it was safe. Their failure to do so constituted negligence.[1]

D. Scope of Protection Element
Under the facts of this case, both Garrett and Clayton had a duty to ascertain whether it was safe to cross the intersection before doing so. Thus, the risk of harm which confronted them can easily be associated with their failure to implement the duty imposed on them.
*220 Accordingly, we find that all four parties were at fault in causing this accident. Since we have found a clearly wrong apportionment of fault, we must now adjust the percentage of fault allocation to each party by lowering it or raising it to the highest or lowest point respectively which is reasonably within the jury's discretion. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96); 666 So.2d 607. The supreme court has given us several factors to consider when apportioning fault of a party:
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985).
Considering the actions of all the parties involved and the above stated factors, we find that the highest percentage of fault that could have been attributed to DPSC is sixty-five percent. We further find that the lowest percentage of fault that could have been attributed to the Sheriff's Department is fifteen percent, with ten percent fault attributed to both Garrett and Clayton. Deputy Pierotti and Troopers Gray and Bergeron, who were superior actors in this incident, were aware of the risk caused by the inoperable traffic light. Thus, their combined actions in failing to control the intersection created a substantial risk to both Garrett and the Nunezes. We further find that Garrett and Clayton, although inferior actors, should be apportioned some degree of fault because both entered the intersection without first determining whether it was safe. Thus, the trial court's judgment is amended to cast DPSC with sixty-five percent of the fault, the Sheriff's Department with fifteen percent of the fault, and both Garrett and Clayton with ten percent of the fault.

GENERAL DAMAGES
In its fourth and fifth assignments of error, DPSC argues that the jury erred in awarding $356,696.90 and $402,641.34 in general damages to Clayton and Lillian, respectively.
In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the supreme court discussed the standard an appellate court must apply when reviewing the award of general damages by a lower court:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.

Clayton
Clayton twice underwent surgery following this accident. Dr. Tom McCalla, a general surgeon, performed surgery after Clayton was admitted to St. Patrick's Hospital on May 28, 1996, complaining of pain in the area of a ventral hernia. Surgery revealed that a small loop of the small intestines had become incarcerated inside the hernia sac, as well as multiple small hernias and adhesions to the small intestines. On March 13, 1997, Dr. McCalla performed a second surgery on Clayton, who was suffering from a small bowel obstruction. *221 An infection developed in the mid-portion of his incision, which eventually caused his navel to fall off. On July 1, 1997, Dr. McCalla noted the development of a hernia at the location of the infection.
Clayton testified that he was sore in the area of his navel following the accident and that he was admitted to the hospital four to five days later because of stomach pain and dehydration from vomiting. He stated that Dr. McCalla operated on him during this time, and that he underwent a second operation nine months later, after which an infection in his sutures caused his navel to fall off. He testified that he remained bedridden for seven weeks following this infection.
In September 1993, Dr. Lucien Moss, a general surgeon, treated Clayton for abdominal pain caused by a partial bowel obstruction and discovered a small hernia at his umbilicus. During an exploratory laparotomy, Dr. Moss removed a piece of the omentum or bowel covering which had become incarcerated in the hernia sac, and repaired the hernia while closing the incision. On February 28, 1994, Clayton's abdomen was swollen and distended, and Dr. Moss discovered multiple hernias in his abdominal incision.
Dr. Moss testified that blunt trauma could possibly cause pain and result in the hernia weakening or enlarging. He further stated that sneezing, coughing, or bowel movements could also cause a hernia to weaken or enlarge, and that Clayton was suffering from asthma and chronic obstructive pulmonary disease. Dr. Moss did not feel that Clayton's hernias should be repaired surgically, due to their large size and because he did not feel that Clayton's other medical conditions would enable an adequate repair of the hernias. Instead, he recommended that Clayton wear an abdominal belt. He testified that he placed no restrictions on Clayton because he felt that his other medical conditions would limit his activities to such an extent that he would not harm the surgical repair.
Dr. William Weldon, a general surgeon, examined Clayton on September 16, 1994, and noted multiple hernias around the lower end of a midline incision, none which appeared to be incarcerated. X-rays revealed a simple large dilated loop of small bowel. Dr. Weldon diagnosed Clayton with: (1) partial small bowel obstruction versus resolving ileus, (2) multiple abdominal wall hernias, (3) chronic obstructive pulmonary disease and asthma, and (4) diabetes. After a small bowel series revealed a possible high grade partial small bowel obstruction, Dr. Weldon successfully performed a nasogastric suction to decrompress the upper intestinal tract. Dr. Weldon testified that he discussed the need for surgical repair of the hernias with Clayton, who later told him that he could not undergo surgery at that time because Lillian had recently undergone coronary by-pass surgery.
Dr. Weldon stated that he placed no restrictions on Clayton because he intended to have the hernias repaired surgically. He stated that incisional hernias must be repaired through surgery, since they cannot heal by themselves, and that they tend to get worse. He stated that a hazard of this type of hernia is that the small bowel will become incarcerated. Dr. Weldon further testified that use of the abdominal wall muscles and increased abdominal pressure from everyday activities will usually cause a hernia to enlarge. He stated that a person suffering from chronic obstructive pulmonary disease will have difficulty breathing and, thus, strain while using the abdominal and chest muscles to breathe. Dr. Weldon testified that it was possible for a person with an incisional hernia to have no problems with the hernia if the hernia does not enlarge. He also stated that the trauma associated with an automobile accident could result in a significant aggravation of a hernia.
Clayton testified that he first learned that he had a hernia after he became sick from eating hot dogs in September 1993. *222 In addition to Dr. Moss, Clayton testified that he was seen by a Dr. Cocchiara, a general surgeon, who told him that he would need surgery if his hernias started bothering him. He also saw Dr. Weldon, who advised that surgery would help his condition.
The Nunezes live on sixty acres in Sugartown. Clayton, who was seventy-one years old at the time of the accident, testified that he planted up to seven acres of watermelons and that he owned and operated an International tractor, a backhoe, a lawn mower, a truck with a welding rig, a car, and an recreational vehicle. Since the accident, he testified that he is unable to grow watermelons and that he had to sell the backhoe and the recreational vehicle. He stated that they sold the recreational vehicle because his wife was unable to drive it and she was scared that something would happen to him while they were traveling. Clayton testified that he is able to cut his grass using the tractor, but that it takes him two to three days instead of the four hours it did prior to the accident, because he is only able to drive the tractor in third gear. He stated that he is also able to take his trash out to the road using the tractor.
Clayton testified that he no longer has any stomach lining since the accident, and that he takes medication regularly for pain. Although he stated that he was wearing a hernia band at the time of his accident, he described the one he is wearing now as much bigger and tighter. Since the accident, he testified that his hernia is much bigger and that it bothers him. Clayton testified that his medical bills since the accident have totaled $31,696.90. Dr. Fayez Shamiah, a neurosurgeon, declared Clayton disabled after he was struck in the head by a cable in 1984 and developed problems with ataxia or balance.
Lillian testified that Clayton did all of the outside work on their property prior to the accident, including planting four to five acres of watermelons, corn and a garden. She stated that they also took trips in their recreational vehicle. Since the accident, she stated that he is able to operate their tractor every one to two weeks, but that they no longer travel.
James McDonald, the Nunezes' neighbor, testified that they owned sixty acres of land and that Clayton planted approximately five acres of watermelons each year prior to the accident. Since the accident, he testified that Clayton has not been able to do the same amount of work on his property that he did before and that they now buy watermelons from him.
The jury awarded Clayton $250,000 in general damages, $31,696.90 in past medical expenses, and $75,000 in disability for a total of $356,696.90 in damages. Considering the effects that this particular accident had on Clayton, we cannot say that the jury erred in awarding him that amount of damages. Although we may feel that this award is on the high end for the amount of damages that a reasonable trier of fact could award, we respect the vast discretion accorded the trier of fact and affirm. However, since we have previously found that Clayton was ten percent at fault in causing this accident, we reduce his award by a corresponding amount.

Lillian
Dr. Shamiah diagnosed Lillian as having suffered a cerebral contusion during the accident and a straining or spraining type of soft tissue injury to her neck, which was superimposed on the aging process of her spine. Although an MRI ordered by Dr. William Foster, a neurosurgeon, revealed a small lacunar infarct, or slight stroke, Dr. Shamiah felt that cerebral contusion was the proper diagnosis based on follow-up tests and her history of suffering no problems prior to the accident. Dr. Shamiah treated Lillian between November 21, 1996 and February 20, 1997. During that time, he noted constant spasm in her neck, which he found to be unusual on a continuing basis this long after the accident. At her last visit, Dr. *223 Shamiah testified that Lillian complained of dizziness, achiness, headache, difficulty sleeping, and a heavy feeling in her arms. He further stated that she was dragging her left foot, which indicated problems with the right side of her brain.
Dr. Shamiah described Lillian's problems as being chronic, resulting not only from her neck injury, but also from post-concussion syndrome. He stated that she would have to learn to live with her symptoms. He testified that Lillian did have pre-existing changes in her neck, which could have been aggravated and made symptomatic by the accident. He further admitted that the obstruction of Lillian's right carotid artery by cardiovascular disease could have caused her to suffer a light stroke. Although it is difficult to differentiate between a lacunar infarct and a small contusion, Dr. Shamiah felt that it was more probable that Lillian was suffering from a contusion.
Dr. Kevin Goran, a physical medicine doctor specializing in rehabilitation and pain medicine, examined Lillian once on June 24, 1998. He stated that she was referred to him for continued care and treatment after sustaining an injury to the right side of her head and face and harness belt trauma in an automobile accident. During that examination, she complained of severe pain in her neck and lower back, radiating up through her shoulders and upper extremities to the base of her skull, as well as intermittently down towards the lower portion of her buttocks.
Dr. Goran noted a fairly severe level of spasms with trigger points in various areas from the base of her skull, into her neck, superior trapezius muscles, and between the shoulder blades. He stated that she exhibited less severe trigger points from her neck through her mid shoulder blades and into the lumbosacral region. He stated that these were the classic locations for post-traumatic trigger points. In addition to the trigger points, he noted some deconditioning, which he stated was expected for her age, which was seventy years.
Dr. Goran arrived at six diagnosis: (1) multiple trauma; (2) traumatic brain injury based on the fact that Lillian may have lost consciousness briefly and suffered a loss of cognitive function; (3) right neuralgia based on her description of numbness and tingling along the right side of her face following the accident; (4) cervical myofacial pain syndrome with trigger points; (5) intermittent bilateral cervical radiculopathy; and (6) adjustment disorder with impaired coping mechanisms based on the fact that she seemed somewhat dysfunctional, unhappy, and uncomfortable with the fact that she was still suffering symptoms years after the accident.
Dr. Goran felt that Lillian's lumbosacral myofascial pain syndrome was related to her neck problems and possibly to her seat belt trauma, and that her complaints of dizziness and headaches were consistent with his diagnoses. He recommended that she undergo an MRI and EEG of the brain, a myelogram and post myelogram CT scan of her cervical spine, and trigger point injections. Dr. Goran felt that Lillian's symptoms were due to the accident, since he did not believe that she suffered any problems prior to that time. Dr. Goran testified that a 100% occlusion of the right carotid artery was unlikely to cause Lillian's dizziness or facial complaints. He further stated that he was unable to determine whether her slight memory impairment resulted from the accident or was merely a result of her age. He stated that this determination would best be made by a neuropsychologist. Although he only examined her once, he felt that Lillian was an ideal candidate for the program of treatment he offered. He testified that the treatment plus medication would cost $5,000 plus per year, not including neuropsychological therapy or counseling.
Dr. Patrick Juneau examined Lillian on May 5, 1998, and diagnosed her as suffering *224 from a muscle ligamentous injury to her neck and lower back, similar to a whiplash type injury. His examination revealed no evidence of pressure on the spinal cord or nerve roots and normal motor, sensory, and reflection exams. He stated that a July 19, 1996 CT scan of the brain revealed a calcified lesion or mass in the right frontal lobe of the brain, which he felt was a benign meningioma commonly found in elderly people. He stated that the test further revealed a lacunar infarct in the deep basil ganglion, which he felt was evidence of an old stroke.
Dr. Juneau did not associate the accident with the meningioma; however, he felt that the stroke predated the accident since it was in a classic location for strokes caused by small vessel disease. He testified that, given Lillian's age, history of blood vessel problems, smoking, and high cholesterol, she was at risk for a stroke, and that this stroke was not caused by the automobile accident. With a left basal ganglion infarct, Dr. Juneau explained that he would expect to see weakness or numbness for a period of time in her left face, arm, and leg, with possible improvements months later. He stated that he had seen no evidence of this. He further testified that carotid dissection usually occurs when the neck is thrown violently during an accident and the wall of the carotid artery is torn. Dr. Juneau testified that persons who develop dissection of the carotid artery can suffer strokes, but that the strokes tend to involve major blood vessels of the brain and are larger in size. He stated that he saw no evidence of this in Lillian.
Lillian testified that she hit her head during the accident, but she was held up by her seat belt after the car landed on its side in the ditch. She stated that she was in and out of consciousness while the rescue personnel were attempting to remove her from the car. After her release from the emergency room, she stated that she was seen by Dr. Foster, who referred her to Dr. Shamiah. She testified that she was also seen by Dr. Juneau, who referred her to Dr. Goran. Although she was only seen by Dr. Goran once, she stated that she would like to return to him for treatment of her back and neck.
Lillian testified that she is unable to do housework and has paid $2,079.70 to have this work done. She stated that she is unable to sleep and that she takes daily medication for dizziness and headaches. She testified that she was going to physical therapy, but stopped because it caused her to suffer terrible headaches. She stated that she suffers bad spells three to four times month.
Lillian testified that she has undergone a triple coronary by-pass surgery and surgery to open her left carotid artery. She admitted that her right carotid artery is also completely blocked. However, she testified that her health was good at the time of the May 20, 1996 accident. Prior to the accident, she testified that she did housework, sewed, and traveled with her husband in their recreational vehicle. Now, she stated that she cannot sew because her back hurts if she sits very long.
The jury awarded Lillian $250,000 in general damages, $75,000 in disability, $21,561.64 in past medical expenses, $54,000 in future medical expenses, $2,079.70 in attendant expenses for a total of $402,641.34 in damages. Considering the effect that this accident has had on this plaintiff, although we may also feel that this award is on the high side, we cannot say that it is unreasonable.
For the preceding reasons, the trial court's judgment awarding damages is amended to reduce the amount of damages awarded to Clayton commiserate with our finding of ten percent of the fault in causing the accident. The award of damages to Lillian is affirmed.

REVERSIONARY TRUST
In its final assignment of error, DPSC argues that the trial court erred in *225 not ordering the award of future medical expenses for Lillian to be paid in accordance with La.R.S. 13:5106(B)(3). We agree. La.R.S. 13:5106(B)(3)(a), which became effective May 9, 1996, provides, in pertinent part:
In any suit for personal injury wherein the court, pursuant to judgment, determines that the claimant is entitled to medical care and related benefits that may be incurred subsequent to judgment, the court shall order that a reversionary trust be established for the benefit of the claimant and that all medical care and related benefits incurred subsequent to judgment be paid pursuant to the reversionary trust instrument.
Thus, the trial court's judgment is amended to order that a reversionary trust in the amount of $54,000 be established for the benefit of Lillian for the payment of all medical care and related benefits incurred subsequent to the judgment.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is amended to apportion sixty-five percent of the fault to the State of Louisiana, Department of Public Safety and Corrections, fifteen percent of the fault to the Calcasieu Parish Sheriff's Department, and ten percent each to Garrett Hoffpauir and Clayton Nunez. The judgment is further amended to reduce Clayton's award of damages by ten percent, from $356,696.90 to $321,027.21. The judgment is affirmed in all other respects. The costs of this matter are assessed $1,240.13 to DPSC and $1,240.12 to the Nunezes.
AFFIRMED AS AMENDED.

ON REHEARING
GREMILLION, Judge.
REHEARING is denied in all respects except that it is granted to correct our math error in the CONCLUSION, which should read as follows:

CONCLUSION
For the foregoing reasons, the judgment of the trial court is amended to apportion sixty-five percent of the fault to the State of Louisiana, Department of Public Safety and Corrections, fifteen percent of the fault to the Calcasieu Parish Sheriffs Department, and ten percent each to Garrett Hoffpauir and Clayton Nunez. The judgment is further amended to reduce Clayton's award of damages by ten percent, from $356,696.90 to $321,027.21. The judgment is affirmed in all other respects. The costs of this matter are assessed $1,240.13 to DPSC and $1,240.12 to the Nunezes. [Editor's Note: Amendment incorporated for publication purposes.]
NOTES
[1] We note La.R.S. 32:232.1 was enacted by Acts 1999, No. 1145 § 1, and provides:

Unless otherwise directed by law enforcement officer, when a traffic-control signal is not functioning at an intersection, the intersection shall revert to an all-way stop and traffic shall proceed in accordance with the provisions of R.S. 32:121(A).
La.R.S. 32:121(A) provides:
When two vehicles approach or enter an intersection from different highways at approximately the same time, the driver of the vehicle on the left, shall yield the right of way to the vehicle on the right.